594 So.2d 428 (1991)
Tommy MALBROUGH, Individually and on Behalf of His Minor Children, Tamala Malbrough and Tiffany Malbrough, and Tammy Malbrough
v.
Jane S. WALLACE, et al.
No. 90 CA 1109.
Court of Appeal of Louisiana, First Circuit.
December 27, 1991.
Writ Denied February 28, 1992.
*430 Michael J. Samanie, Houma, for plaintiffs and appellees Tommy Malbrough et al.
Frederick A. Miller, Metairie, Vincent P. Fornais, Baton Rouge, for defendant and appellant Hartford Cas. Ins. Co.
Before SHORTESS, LANIER, and CRAIN, JJ.
SHORTESS, Judge.
Tammy Malbrough (plaintiff) was injured in an automobile accident which occurred on July 26, 1985, in Houma, Louisiana. She sued the owner and driver of the other vehicle and their insurers, as well as her own uninsured motorist carrier, Hartford Casualty Insurance Company (Hartford).[1] Her husband, Tommy Malbrough (Malbrough), joined in the suit claiming property damage and loss of consortium.[2] (The Malbroughs are referred to herein collectively as plaintiffs.)
Liability of the adverse driver was stipulated. Plaintiffs settled with the tort-feasor's insurer before trial and received its policy limits of $10,000.00. Plaintiffs accepted a tender from Hartford of $2,500.00, plus payment of medical bills totaling $1,457.00.
The case was originally tried August 25-27, 1987. The jury was unable to agree on whether plaintiff's injuries resulted from the accident. A mistrial was declared.
*431 The case was retried beginning October 30, 1989. The jury returned a special verdict in favor of plaintiffs, awarding plaintiff a total of $568,256.54 and Malbrough $25,000.00. The jury also found Hartford arbitrary and capricious in tendering plaintiffs only $2,500.00 before trial and awarded attorney's fees of "1/3."[3]
The parties stipulated before trial that Hartford's policy limits were $100,000.00. The trial court entered judgment in favor of plaintiff in the sum of $93,210.00, together with legal interest on the sum of $556,306.54[4] from date of judicial demand, a statutory penalty of $55,630.65, attorney fees of $189,051.08, and legal interest on the penalty and attorney fees from date of judicial demand. The trial court entered judgment in favor of Malbrough in the sum of $4,290.00, together with legal interest on the sum of $24,450.00[5] from date of judicial demand, a statutory penalty of $2,445.00, attorney fees of $8,701.10, and legal interest on the penalty and attorney fees from date of judicial demand. From this judgment Hartford appeals.
Hartford's assignments of error on appeal include several evidentiary issues, as well as the amount of damages awarded, the finding that it was arbitrary and capricious, and the date from which the trial court held interest began to run on the excess judgment, penalties, and attorney fees. We will first address the evidentiary issues.

I. EVIDENTIARY ISSUES
A. Admission of Videotape
Hartford contends the trial court erred in permitting the jury to view a 55-minute videotape of the plaintiff's microlaminectomy. After viewing the entire videotape, we agree.
The admissibility of a videotape is largely within the discretion of the trial judge. LaFleur v. John Deere Co., 491 So.2d 624, 632 (La.1986); United States Fidelity & Guaranty Co. v. Hi-Tower Concrete Pumping Service, 574 So.2d 424, 438 (La.App.2d Cir.), writs denied, 578 So.2d 136, 137 (La.1991); Ashley v. Nissan Motor Corp., 321 So.2d 868, 872-873 (La. App. 1st Cir.), writ denied, 323 So.2d 478 (La.1975). Determination of the admissibility into evidence of videotapes must be done on a case-by-case basis depending on the individual facts and circumstances of each case. Douglas v. G.H.R. Energy Corp., 463 So.2d 5, 7 (La.App. 5th Cir. 1984). The trial court must consider whether the videotape accurately depicts what it purports to represent, whether it tends to establish a fact of the proponent's case, and whether it will aid the jury's understanding. Against those factors, the trial court must consider whether the videotape will unfairly prejudice or mislead the jury, confuse the issues, or cause undue delay. The trial court may exclude the evidence if the factors favoring admission are substantially outweighed by the factors against admission. Louisiana Code of Evidence articles 401-403; Hi-Tower, 574 So.2d at 438; Burk v. Illinois Central Gulf Railroad Co., 529 So.2d 515 (La.App. 1st Cir.), writ denied, 532 So.2d 179 (La. 1988).
Plaintiff's neurosurgeon, Dr. Donald Judice, used an operating microscope in performing the surgery on plaintiff's back. A camera attached to the microscope filmed the surgery as seen through the microscope. The resulting videotape is an extreme close-up of this bloody surgery. Plaintiffs contend this videotape proved plaintiff had "gigantic ruptured disks." However, a viewer without a medical education cannot ascertain that plaintiff's disks were abnormal by seeing this videotape; no normal disks are shown with which to compare the disks shown on videotape.[6]
*432 Much of the material shown on this videotape, such as the cutting of plaintiff's fat, the smoke rising from her muscles as they were cauterized, and the removal of gory packing material from the wound, served no purpose other than to inflame and prejudice the jury. Had the videotape been restricted to only the portion showing the abnormal disks, our opinion might be different. However, this lengthy videotape was repetitive of Judice's testimony and had very little probative value to a viewer not trained in medicine. For these reasons we find the trial court committed legal error in admitting the videotape of plaintiff's surgery.
B. Exclusion of Trial Transcript and Testimony of Nancy Burgess Regarding First Trial
Hartford contends the trial court erred in excluding the testimony of Nancy Burgess, its claims supervisor who handled plaintiffs' claim, regarding the first trial and the impact of the mistrial on her decision not to make an additional tender to plaintiffs. Hartford contends the trial court also erred in excluding the transcript of the first trial.
Burgess' proffered testimony shows she attended the first trial and heard the foreman announce the jury could not reach a decision on the first interrogatory, whether plaintiff's injuries were caused by the accident. She had also reviewed the portion of the trial transcript regarding the jury foreman's statements. She testified this knowledge confirmed her original opinion that reasonable minds could differ as to the amount Hartford owed.
The jury was asked to determine at the second trial whether Hartford, through Burgess, was arbitrary and capricious in tendering only $2,500.00 to plaintiffs. The facts on which Burgess based her decision not to make a further tender were relevant and should have been placed before the jury. We find the trial court committed legal error in excluding this testimony.
It is unclear from the record whether Hartford wanted to introduce the entire transcript of the first trial or only the portion of the transcript regarding the jury's inability to reach a decision on the issue of causation. In either case, we find the trial court did not err in excluding this evidence. The transcript of the jury foreman's unsworn colloquy with the trial court adds little to Burgess's testimony and would have been confusing to the jury. The transcript of the entire first trial, including the testimony of many of the same witnesses who testified at the second trial, would have been even more confusing to the jury. Hartford contends it could have been introduced with limiting instructions to make it clear to the jury that it was being introduced only insofar as it was relevant to the issue of Hartford's good faith evaluation of plaintiffs' claims. We find, however, that the confusion to the jury would have outweighed the probative value of the transcript. C.E. art. 403.

II. DAMAGES
Hartford complains the general damages awarded by the jury to plaintiff and the damages for loss of consortium awarded to Malbrough were excessive. Hartford also contends the trial court erred in adopting the jury's verdict awarding damages to plaintiff for past lost earnings and loss of future earning capacity. The evidentiary errors made by the trial court were decidedly prejudicial to Hartford's case and so tainted the jury's findings that they are entitled to be given no weight by this court on appeal. We thus must conduct a de novo review of the record, disregarding the prejudicial videotape and considering the improperly excluded testimony of Burgess, and render judgment on the merits. Buckbee v. United Gas Pipe Line Co., 561 So.2d 76, 85-87 (La.1990). We now summarize the facts relevant to the damages issues.
*433 A. Facts
Plaintiff Malbrough graduated from high school in 1977. Plaintiff married Malbrough in 1978. Their daughters Tamala and Tiffany were born in 1980 and 1981, respectively.
Plaintiff began working as a skin therapist at her mother's business, Derma Culture Clinic, when she graduated from high school. The work involved constant leaning over tables and put a great deal of pressure on her back, causing occasional backaches.
Plaintiff's pre-accident medical history included the following:
(1) Treatment by a family doctor for two weeks for a "run-of-the mill backache" after she hurt her back picking up a heavy water jug in 1977.
(2) Treatment by a family doctor for back pain which began suddenly while bending over her baby's bed in May 1983.
(3) Four visits to Dr. Richard Whitney, a chiropractor, for the May 1983 backache, which was diagnosed, based on a positive straight leg raising test, as an acute lumbar intervertebral disk lesion.
(4) A finding in May 1983 by Whitney, based on x-rays, that plaintiff had spina bifida occulta, a malformation of the neural tube in the first sacral segment.
(5) One visit to a chiropractor in May 1984 for a backache, diagnosed as muscle strain, which she thought may have been caused by picking up her baby.
(6) A call to her family doctor inquiring whether a back brace would help support her back, although there was no indication in the doctor's records that a back brace was ever prescribed.
(7) A statement to a state vocational rehabilitation counselor in April 1985 that her back had been giving her a great deal of trouble, she felt she would not be able to work as a skin therapist much longer, and she could "no longer work at this because of bending."
(8) An orthopedic evaluation for purposes of vocational rehabilitation in April 1985 in which plaintiff told the orthopedist she had had back pain for three years. The orthopedist diagnosed spondylolysis of the L-5 lumbar vertebra and chronic (i.e., lasting more than six months) back sprain secondary to spondylolysis.
This accident occurred July 27, 1985. Plaintiff did not notice any pain immediately after the accident. She testified she was more concerned about her daughters, who were in the car with her at the time of the accident, than she was about herself. After having the girls examined and learning they were uninjured, she started to relax. She then realized her neck and shoulder hurt very badly.
Plaintiff saw Dr. Jules Dupont, a family doctor, about an hour after the accident. She had no back pain at that time. Dupont prescribed muscle relaxers and told her to go home and relax. While lying in bed at home, she noticed pain in her ribs and hips and a burning sensation from the top of her neck down her spine. She called Dupont within a week after the accident and told him her neck pain was not improving and that her ribs and hips hurt. She asked Dupont to refer her to Judice, a neurosurgeon recommended by her aunt. She took the first available appointment with Judice, which was August 13, 1985.
Plaintiff gave a history to Judice in which she denied any significant spinal trauma or neck injury before the accident. She did not mention any past medical or physical problems. She testified she did not tell Judice about the spondylolysis or the spina bifida occulta on the first visit because she was not seeking treatment for those conditions. She did not tell Judice about the chiropractic visits or the rehabilitation evaluation by Rhymes for two reasons: (1) in her opinion, the problems for which she saw those doctors was unrelated to her complaints after the accident; and (2) the birth defect Whitney advised her of was "unconfirmed in my mind."
Plaintiff complained initially of pain in her neck and between her shoulder blades and a burning sensation down her back. Judice diagnosed cervical sprain and ordered conservative treatment. Those complaints resolved in a matter of months.
*434 However, on September 23, 1985, two months after the accident, plaintiff complained of leg and back pain. Judice found no numbness or weakness in her legs; his initial diagnosis was lumbar strain. A CT scan of her lumbar spine done on September 27, 1985, however, showed a broad-based disk bulge at the L-4 level.
Judice recommended conservative treatment. In March or April 1986 plaintiff learned she was pregnant. Judice did not want to do any tests or prescribe any medication while she was pregnant; he did not see her again until after the baby, Tommy, Jr., was born in January 1987.
Plaintiff's back pain worsened while she was pregnant. She worked full-time after the accident until a month before Tommy, Jr., was born, despite the pain, because of her family's financial situation. She testified she took early maternity leave because she was too uncomfortable to work any longer.[7]
On March 27, 1987, Judice performed a CT scan of plaintiff's lumbar spine. This test showed a disk herniation at the L-3 and L-4 levels. Judice testified the L-3 bulge was not shown on the earlier CT scan, but that area of her back was not adequately scanned the first time.
Dr. Robert Applebaum, a neurosurgeon, examined plaintiff at the request of Hartford in August 1987. He reviewed her tests and medical records and conducted a neurological examination which lasted approximately twenty minutes. He testified he found minimal bulging on both the 1985 and 1987 CT scans at the L-3/4 and L-4/5 levels but no evidence of a herniated or ruptured disk. The straight leg raising test was negative. He felt no further testing or surgical treatment was necessary and she could return to any work for which she was otherwise qualified. In Applebaum's opinion, the only injuries plaintiff sustained as a result of the accident were a possible mild concussion and a cervical strain.
Plaintiff testified her pain worsened despite conservative treatment. In May 1988 Judice admitted her to the hospital, where he placed her in traction and gave her intravenous pain medication. A lumbar MRI taken while she was hospitalized confirmed the bulges at L-3 and L-4 shown on the CT scan. Finally, in June 1988 Judice performed a microlaminectomy on plaintiff's disks at the L-3 and L-4 levels. Judice testified plaintiff got good relief from the surgery but continued to have occasional back and leg pain. Plaintiff testified she could walk again after the surgery, but she had little feeling in the lower part of her leg for four to five months after surgery.
Judice performed an MRI on plaintiff about a month before the 1987 trial because of her continued complaints. The test showed "a bit of a problem" because the L-3 disk is now beginning to bulge or prolapse into the spinal canal. If she continues to have symptoms, Judice will have to fuse the L-3 and L-4 vertebrae to correct the instability, which will cost from $15,000 to $18,000. He could not estimate how long he would have to treat her if she required a fusion.
Because of the prolapsed disk, Judice placed the following restrictions on plaintiff: (1) do not lift more than 15 pounds; (2) do not carry more than 10 pounds; (3) do not work on anything that vibrates heavily, such as a truck or boat; (4) avoid stair climbing, never climb ladders, and never work in a job with slippery or rough surfaces. He assigned her a 20%-25% disability of the body as a whole.
Before the surgery, it was Judice's opinion that the September 1985 back pain could have been caused by a combination of her spondylolysis and the disk. At trial, however, he testified that after seeing the size of the herniation during surgery, he was convinced the pain was all caused by the disks.
Judice opined that, based on the history given him by plaintiff, the herniated disks at L-3 and L-4 were caused by the July *435 1985 automobile accident because of the progression of her symptoms; that there was no way to tell the age of a disk bulge from a CT scan; that the bulge he found in September 1985 could have pre-existed the automobile accident and may have been caused by pre-July 1985 traumas; that in his opinion, however, plaintiff would have had consistent symptoms from 1983 to 1985 if she had had a disk; and that she would have needed to see a neurosurgeon (as opposed to a chiropractor) for relief.
Pregnancy can aggravate or even cause a disk bulge. Plaintiff did not complain of radicular pain until after Tommy, Jr., was born. However, Judice found it significant that plaintiff had two other pregnancies without back pain. In his opinion, her pregnancy did not cause the ruptured disk at L-3, although it aggravated her problems.
Since the surgery plaintiff has also seen a urologist, Dr. Frank Graffagnino, because of difficulty controlling her urine. All of the tests done by Graffagnino were normal except that her bladder does not empty completely. The only thing he could attribute this to is pain, i.e., that if she has pain while voiding her urethra closes prematurely. In Graffagnino's opinion, the voiding problem will probably remain as long as plaintiff has back pain.
At the time of trial, plaintiff relied on Malbrough for help around the house. She was working at Derma Culture two days a week for four to five hours per day. The week before trial she filled in at Derma Culture for her sister, Penny, who had the flu. After working a full day, she was very tired and in pain. She was trying to gradually build up her ability to work.
Plaintiff testified that before the accident she took the girls to the mall shopping and played with them outside. Now she shops by catalog, and her sisters take the kids shopping. She no longer has as much patience with the children as she did before the accident. The only thing they do together as a family now is go walking at night so the children can ride their bicycles.
Plaintiff has not worked full time since taking maternity leave in December 1986. She introduced evidence which showed she earned approximately $1,000.00 per month in 1985 and 1986.
B. General Damages
We find the preponderance of the evidence shows plaintiff suffered herniated disks at L-3 and L-4 as a result of the accident. In our opinion, the testimony of Judice, the board-certified neurosurgeon who treated plaintiff from a month after the accident until trial, is entitled to greater weight and is more credible than that of Whitney, the chiropractor who diagnosed a disk lesion in 1983, and Applebaum, who saw plaintiff for only twenty minutes. While her disk problems may have been aggravated by her pregnancy, this is a foreseeable consequence of a back injury to a woman of child-bearing age.
Considering plaintiff suffered from back pain for three years before surgery, underwent a two-level microlaminectomy which left her with a 20-25% disability of the body as a whole, and will probably need a subsequent surgery to fuse her L-3 and L-4 vertebrae, we find she is entitled to an award of general damages of $150,000.00. This sum includes her damages for past and future mental and physical pain and suffering and permanent disability.
C. Special Damages
The jury's verdicts of $23,256.54 for past medical expenses and $27,000.00 for future medical expenses were not appealed and are now final. Based on the evidence in the record, we find the sum of $83,000.00 will adequately compensate plaintiff for lost earnings and loss of future earning capacity.
D. Malbrough's Loss of Consortium Claim
Plaintiff's general and special damages total $283,256.54, well in excess of Hartford's policy limits of $100,000.00 per accident. Malbrough proved a loss of consortium at trial. However, his loss of consortium claim is only derivative, arising out of plaintiff's injuries. His claim is therefore *436 restricted to the monetary limits of the policy. Those limits have been exhausted by plaintiff's claim. Malbrough's claim for loss of consortium has thus been extinguished. Shepard v. State Farm Mutual Automobile Insurance Co., 545 So.2d 624, 630 (La.App. 4th Cir.) writs denied, 550 So.2d 627, 628 (La.1989); Carroll v. State Farm Insurance Co., 519 So.2d 265, 267-268 (La.App. 5th Cir.), writ denied, 520 So.2d 756 (La.1988); Albin v. State Farm Mutual Automobile Insurance Co., 498 So.2d 171 (La.App. 1st Cir.), writ denied, 498 So.2d 1088 (La.1986). The trial court's judgment in favor of Malbrough is thus clearly wrong and must be reversed.
III. APPLICABILITY OF LSA-R.S. 22:658
A. Was Hartford Arbitrary and Capricious?
Hartford contends the trial court erred in finding it was arbitrary and capricious in tendering only $2,500.00 to plaintiffs.
Plaintiffs who seek penalties and attorney fees under LSA-R.S. 22:658 have the burden of proving the insurer was arbitrary and capricious in failing to unconditionally tender the reasonable amount of damages due, i.e., the amount over which reasonable minds could not differ, within 60 days after receipt of satisfactory proof of loss. A satisfactory proof of loss within the meaning of R.S. 22:658 is that which is sufficient to fully apprise the insurer of the insured's claim. McDill v. Utica Mutual Insurance Co., 475 So.2d 1085, 1089 (La. 1985); Barnes v. Thames, 578 So.2d 1155 (La.App. 1st Cir.1991, writ denied, 577 So.2d 1009 (La.1991). Thus, in order for plaintiff to prevail on her claim for penalties and attorney fees, she must show that Hartford received satisfactory proof of loss, that Hartford failed to tender within 60 days the amount over which reasonable minds could not differ, and that Hartford was arbitrary and capricious in so doing.
On February 10, 1987, Hartford was provided with copies of all of plaintiff's medical records, including a report of Judice dated October 4, 1985, which refers to the bulging disk at L-4, a radiologist's report reporting the bulging disk, and reports from Judice showing a ten- to twelve-month cervical sprain and continuing complaints of low back pain. Based on these records, Hartford concluded plaintiff had only cervical and lumbar sprains as a result of the accident and tendered $2,500.00 on April 10, 1987. It was Hartford's position at that time that reasonable minds could not differ that plaintiff's damages were at least $12,500.00.[8]
Nancy Burgess, Hartford's adjuster, testified she had no information at the time the tender was made that the bulging disk was related to the accident. However, she had no information that it was not. In June 1987 plaintiff's counsel provided Hartford with a copy of the CT scan and MRI showing the disk bulges at L-3 and L-4. In July 1987 Hartford deposed Judice and learned that in his opinion the disk bulges were caused by the accident. However, Burgess testified she did not give a great deal of credibility to any information received from Judice after mid-1987 because "he generally leans towards the injured party."
In August 1987 Applebaum examined plaintiff at Hartford's request and rendered his opinion that the only injuries she received as a result of the accident were the cervical strain and a possible concussion. He noted the bulging disks but did not find them significant. Later that same month the jury could not reach a verdict on the issue of whether plaintiff had any injuries caused by the accident. Burgess testified she took these factors into account in deciding not to make an additional tender. However, we note the weight Burgess gave the mistrial should have been minimal since she herself admitted plaintiff sustained cervical and lumbar strains in the accident.
We would have had difficulty finding Hartford arbitrary and capricious at this point in view of the conflicting medical testimony. See Thomas v. Hanover Insurance Co., 477 So.2d 1171, 1174 (La.App. 1st *437 Cir.1985), aff'd., 488 So.2d 181 (La.1986). An insurer should not be cast for penalties and attorney fees simply for exercising its right to litigate a disputed claim.
However, by April 21, 1989, Hartford had received the records of Judice and Terrebonne General Medical Center showing plaintiff had undergone a two-level microlaminectomy to relieve her pain from the bulging disks. At this point Hartford could no longer rely on Applebaum's opinion that plaintiff's bulging disks were "insignificant." Even considering Whitney's 1984 diagnosis of a lumbar disk lesion, Hartford was aware at this point that it owed damages, at a minimum, for aggravation to the extent surgery was required for a pre-existing disk problem. Despite receiving this additional medical information, Hartford made no further tender within 60 days of April 21, 1989.
An assessment that plaintiff's damages were only $12,500.00 at this point was clearly unreasonable. We find that Hartford acted arbitrarily and capriciously in failing to make a further tender to plaintiff within 60 days of April 21, 1989. They are thus liable for penalties and attorney fees under LSA-R.S. 22:658.
B. Penalties
LSA-R.S. 22:658 has been amended numerous times, and the amount of the statutory penalty has varied during the course of this litigation. The applicable statutory penalty is determined by the time the right to that penalty came into existence, which in this case was June 20, 1989. Gulf Wide Towing v. F.E. Wright (U.K.), 554 So.2d 1347, 1354 (La.App. 1st Cir.1989). At that time, the penalty was "ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount." The penalty is calculated on the loss alone and does not include any legal interest that may become due. Shepard v. State Farm Mutual Automobile Insurance Co., 545 So.2d 624, 631 (La.App. 4th Cir.), writs denied, 550 So.2d 627, 628 (La. 1989).
Hartford is entitled to a credit for the portion of the damages within the liability limits of Champion, the tortfeasor's insurer. Niemann v. Travelers Insurance Co., 368 So.2d 1003 (La.1979). Thus, the "amount found to be due" is plaintiff's total damages of $283,256.54 less Champion's policy limits of $10,000.00, or $273,256.54. The difference between that figure and the amount tendered of $2,500.00 is $270,756.54. Hartford is thus liable to plaintiff for a penalty of $27,075.65.
C. Attorney Fees
Hartford contends the attorney fees awarded plaintiff of $189,051.08 are excessive and an abuse of the trial court's discretion. The jury awarded plaintiff attorney fees of "1/3." The trial court properly converted this to a dollar figure in the judgment.
An award of attorney fees in a case such as this should be based on the services needed to effect recovery, the degree of the professional skill and ability exercised, the volume of work performed, the time devoted to the case, the result obtained, the amount in controversy, the novelty and difficulty of the questions involved, and the percentage fixed for attorney fees in the plaintiff's contract with his attorney, if based on a contingency. Shepard v. State Farm, 545 So.2d at 631; Louisiana Rules of Professional Conduct, Rule 1.5. The trial court has much discretion in fixing an award of attorney fees, and its award will not be modified on appeal absent a showing of an abuse of discretion. Gulf Wide Towing, 554 So.2d at 1355 (La. App. 1st Cir.1989).
This case was tried twice, each jury trial lasting four days. This litigation also involved numerous depositions, motions, and pleadings. Liability was stipulated, and there were no novel questions of law involved at the trial court level. Plaintiffs' counsel testified his firm does not keep time records, but he estimated the *438 firm spent 225 to 250 hours on the suit.[9] He testified he has never worked for an hourly rate but always charges a 1/3 contingency fee. He obviously achieved a good result for his client.
In light of our reduction of the award to plaintiff and the reversal of the award to Malbrough, the trial court's award of $189,051.08, or approximately 2/3 of the award to plaintiff, is clearly excessive and an abuse of discretion. In our opinion an award of $90,252.18 (1/3 of $270,756.54) for attorney fees is more appropriate and reasonable under the facts of this case.

IV. INTEREST
Hartford contends the trial court erred in awarding interest on the excess judgment and on the penalties and attorney fees from date of judicial demand. Hartford also contends the trial court erred in admitting evidence of plaintiffs' settlement with the primary insurer after trial and in ordering Hartford to pay interest on the portion of plaintiffs' damages paid by the primary insurer.
The trial court erred in awarding damages on the portion of the judgment in excess of Hartford's limits from date of judicial demand. The Hartford policy contains a supplementary payments clause which provides in pertinent part: "In addition to our limit of liability, we will pay on behalf of a covered person: ... 3. Interest accruing after a judgment is entered in any suit we defend." In Barnes v. Thames, 578 So.2d 1155, 1170 (La.App. 1st Cir.1991), this court, sitting en banc, held that insurers intend by this clause to provide supplementary protection to their insureds for interest accruing after entry of judgment. The uninsured motorist insurer in Barnes was held liable for legal interest on the excess portion of the judgment only from date of judgment until paid. See also Remedies v. Lopez, 560 So.2d 118, 120 (La. App. 3d Cir.), writ denied, 563 So.2d 1155 (La.1990); Pugh v. Gondrella, 522 So.2d 1257, 1258 (La.App. 4th Cir.1988); Doty v. Central Mutual Insurance Co., 186 So.2d 328, 333-336 (La.App. 3d Cir.), writ denied, 187 So.2d 451 (La.1966).
The trial court also erred in awarding interest on the penalties and attorney fees from date of judicial demand. The law is well settled that because penalties and attorney fees are not ascertainable until awarded by the court, interest will run on those awards only from the date awarded. Alexander v. Burroughs Corp., 359 So.2d 607, 613-614 (La.1978); Francis v. Travelers Insurance Co., 581 So.2d 1036, 1045 (La.App. 1st Cir.1991); Hampton v. Rubicon Chemicals, 579 So.2d 458, 470 (La.App. 1st Cir.1991); Gulf Wide Towing, 554 So.2d at 1355.
Hartford contends the plaintiffs waived any right to interest from Hartford on amounts other than Hartford's $100,000.00 limits by failing to reserve the right to interest when it settled with Champion. Hartford bases this contention on a misreading of Pugh v. Gondrella. In Pugh, the plaintiff settled with the tort-feasor's liability carrier for its policy limits and entered into a "limited release." The release did not contain a specific reservation of the right to proceed against the uninsured motorist carrier for interest on the primary carrier's policy limits. The court relied on La.C.C. art. 2925 to hold that plaintiffs had waived their right to any interest on the amount paid by the primary insurer. Article 2925 provides:
The release of the principal, without any reserve as to interest, raises the presumption that it also has been paid, and operates a release of it.
Thus, in this case, if the plaintiffs failed to specifically reserve their right to proceed against Hartford for the interest on Champion's $10,000.00 policy limits, they waived their right to interest on that $10,000.00, not the excess judgment as contended by Hartford.
Plaintiffs failed to introduce the release during the trial. However, the trial court permitted the plaintiffs to introduce the release during a hearing on Hartford's motion *439 for judgment notwithstanding the verdict approximately one month after the completion of the trial. Hartford contends the trial court erred in permitting the introduction of the release at that time.
The trial court's decision to reopen a case for additional evidence is discretionary and will not be disturbed absent a clear abuse of discretion. La.C.C.P. arts. 1631, 1632; American Bank & Trust v. McDowell, 545 So.2d 1211, 1214 (La.App.2d Cir.1989). Even if the settlement document was improperly admitted, however, the error was harmless. The release contains no specific language reserving plaintiffs' right to proceed against Hartford for the interest on Champion's limits. It simply states plaintiffs are "reserving all rights to proceed against the uninsured motorist carrier." This language is insufficient to reserve plaintiffs' right to recover from Hartford interest on the sum paid by Champion to the plaintiffs in 1987.

V. CONCLUSION
For the foregoing reasons, the judgment in favor of Tommy Malbrough and against Hartford Casualty Insurance Company is reversed. The judgment in favor of plaintiff and against Hartford Casualty Insurance Company is amended to read as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiff, Tammy Malbrough, and against defendant, Hartford Casualty Insurance Company, in the full and true sum of ninety-seven thousand, five hundred and no/100 ($97,500.00) dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of plaintiff, Tammy Malbrough, and against defendant, Hartford Casualty Insurance Company, for legal interest on the sum of $173,256.54 from the date of the trial court judgment, November 6, 1989, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of plaintiff, Tammy Malbrough, and against defendant, Hartford Casualty Insurance Company, for a penalty pursuant to LSA-R.S. 22:658 of $27,075.65, together with legal interest thereon from the date of the trial court judgment, November 6, 1989, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of plaintiff, Tammy Malbrough, and against defendant, Hartford Casualty Insurance Company, for attorney fees of $90,252.18, together with legal interest thereon from the date of the trial court judgment, November 6, 1989, until paid."
The remainder of the judgment of the trial court regarding expert fees was not appealed and is final. Costs of this appeal are assessed against Hartford.
REVERSED IN PART, AMENDED IN PART, AND, AS AMENDED, AFFIRMED.
LANIER, J., concurs in part and dissents in part and assigns reasons.
LANIER, Judge, concurring in part and dissenting in part.
I dissent in part because (1) Hartford had a reasonable basis to litigate the factual question of whether Mrs. Malbrough's bulging lumbar discs were causally related to the July 26, 1985 accident, and is not liable for the statutory penalties of La.R.S. 22:658; (2) the majority misinterprets La. R.S. 22:658 to award a legally excessive penalty to the plaintiffs; and (3) the majority awards a grossly excessive attorney fee.

ENTITLEMENT TO STATUTORY PENALTIES
The majority holds that the plaintiffs' right to the statutory penalties of La.R.S. 22:658 came into existence on June 20, 1989, citing Gulf Wide Towing, Inc. v. F.E. Wright (U.K.) Limited, 554 So.2d 1347 (La. App. 1st Cir.1989). At that time, La.R.S. 22:658 provided, in pertinent part, as follows:
A. All insurers issuing any type of contract, other than those specified in *440 R.S. 22:656 and R.S. 22:657, shall pay the amount of any claim due any insured, including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950, within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest.
B. (1) Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount. (Emphasis added)
La.R.S. 22:658 is subject to the general rules of statutory interpretation found in Bunch v. Town of St. Francisville, 446 So.2d 1357, 1360 (La.App. 1st Cir.1984) as follows:

When a law or ordinance is clear and free from all ambiguity, it must be given effect as written....
When interpreting a law (ordinance), the court should give it the meaning the lawmaker intended. It is presumed that every word, sentence or provision in the law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. Conversely, it will not be presumed that the lawmaker inserted idle, meaningless or superfluous language in the law or that it intended for any part or provision of the law to be meaningless, redundant or useless. The lawmaker is presumed to have enacted each law with deliberation and with full knowledge of all existing laws on the same subject. The meaning and intent of a law is to be determined by a consideration of the law in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express terms of the law and with the obvious intent of the lawmaker in enacting it. Where it is possible to do so, it is the duty of the courts in the interpretation of laws to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions. A construction of a law which creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the law and will carry out the intention of the law maker....
When the expressions of a law are "dubious", the most effectual way of discovering the true meaning of the law is to consider the reason and spirit of it, or the cause which induced the lawmaker to enact it.... When a law is susceptible to two or more interpretations, that which affords a reasonable and practical effect to the entire act is to be preferred over one which renders part thereof ridiculous or nugatory.... If there is an irreconcilable conflict between the provisions of a law, only one provision can prevail.
(Emphasis added; citations omitted)
See also La.R.S. 1:1 et seq.; La.C.C. art. 9 et seq.; Achee v. Louisiana State Employees' Retirement Board, 527 So.2d 1116, 1118-1119 (La.App. 1st Cir.1988); Notoriano v. Anthony, 527 So.2d 1120, 1121-1122 (La.App. 1st Cir.1988).
Further, because La.R.S. 22:658 is a penal statute, it must be strictly construed. Scott v. Insurance Company of North America, 485 So.2d 50 (La.1986).

Was Hartford arbitrary, capricious or without probable cause? Did Hartford have a reasonable basis to defend?
Since La.R.S. 22:658 is penal in nature, its sanctions should be imposed only in those instances in which the facts negate probable cause for nonpayment. Scott v. Insurance Company of North America, 485 So.2d at 52. A claimant for a penalty *441 and an attorney fee under the statute has the burden of proving that the insurer did not pay the claim within 60 days after receiving a "satisfactory proof of loss" of the claim, and that the insurer was arbitrary, capricious or without probable cause in failing to pay. Cantrelle Fence and Supply Company, Inc. v. Allstate Insurance Company, 515 So.2d 1074 (La.1987); McDill v. Utica Mutual Insurance Company, 475 So.2d 1085 (La.1985). A "satisfactory proof of loss" within the meaning of La.R.S. 22:658 is that which fully apprises the insurer of the insured's claim. McDill v. Utica Mutual Insurance Company, 475 So.2d at 1089. Whether or not a refusal to pay benefits is arbitrary, capricious or without probable cause depends primarily on the facts known to the insurer at the time of its action. Scott v. Insurance Company of North America, 485 So.2d at 52. La.R.S. 22:658 is not applicable when the insurer has a reasonable basis to defend against the claim. Fay v. Willis, 577 So.2d 1147 (La.App. 1st Cir.), writ denied, 584 So.2d 1159 (La.1991).
Mrs. Malbrough's back problems commenced in 1977, when she hurt her back picking up a heavy water jug. She was treated for two weeks thereafter by her family doctor. In May of 1983, she again hurt her back while bending over her baby's bed. On May 16, 18, 20 and 25, 1983, she saw Dr. Richard Whitney who diagnosed her condition as acute lumbar intervertebral disc lesion and spina bifida occulta (a malformation of the neural tube in the first sacral segment). In May of 1984, she visited a chiropractor for a backache diagnosed as muscle strain caused by picking up her baby.
On April 11, 1985, Mrs. Malbrough contacted the Division of Vocational Rehabilitation, Office of Human Development, Department of Health and Human Resources, State of Louisiana, for the vocational rehabilitation training, guidance, counseling and job placement. She advised that she was "presently working as a skin therapist and has worked there for the last 7 years", but that "she won't be able to do this type of work much longer because she is constantly bent over the person whom she is working on and it is causeing [sic] her to have a lot of pain in her back." She stated she was interested in training at a beauty school. She was referred to Dr. Pete H. Rhymes for an orthopedic evaluation and Dr. Rhymes examined her on April 17, 1985. Dr. Rhymes diagnosed Mrs. Malbrough's orthopedic problems as (1) a spondylolitic defect of L5 without spondylolisthesis, (2) a chronic back sprain secondary to the first condition, (3) sprained left ankle, and (4) sprained right knee.
The accident herein occurred on July 27, 1985.
Mrs. Malbrough did not have symptoms in her lumbar spine immediately after the accident. She did have pain in her cervical spine (neck) and shoulder. She consulted with her family doctor who prescribed muscle relaxers and told her to go home and relax. When her symptoms persisted, she was referred to Dr. Donald J. Judice, a neurosurgeon, who examined her on August 13, 1985. Mrs. Malbrough did not tell Dr. Judice about her prior back problems. She complained of pain in her neck and between her shoulder blades and of a burning sensation down her back. Dr. Judice diagnosed Mrs. Malbrough's condition as a cervical sprain. This condition was successfully treated. Mrs. Malbrough continued working full time.
Mrs. Malbrough saw Dr. Judice again on September 23, 1985, and complained of leg and back pain. A CT scan was performed on her lumbar spine on September 27, 1985. Dr. Judice was of the opinion it showed a bulging disc at the L-4 level. Dr. Judice diagnosed this condition as a lumbar sprain and recommended conservative treatment.
This suit was filed on October 30, 1985.
In March or April of 1986, Mrs. Malbrough learned she was pregnant. However, she continued working full time until about a month before her child was born in January of 1987. During this time, Dr. Judice did not prescribe any medication or perform any diagnostic testing.
On February 9, 1987, Mr. and Mrs. Malbrough settled their claims against the tortfeasors and their liability insurer, Champion *442 Insurance Company (Champion), for Champion's policy limits of $10,000.
On March 27, 1987, Dr. Judice performed a second CT scan on Mrs. Malbrough's lumbar spine, and he was of the opinion it showed herniated discs at the L-3 and L-4 levels.
By letter dated April 10, 1987, Hartford (through its attorneys) tendered $2,500 to the attorney for the plaintiffs. This letter stated, in pertinent part, as follows:
I have looked at all of the above-mentioned facts very carefully in an attempt to determine what amount of pain and suffering the doctors who have seen Mrs. Malbrough thusfar can directly relate to the accident which is the basis her [sic] lawsuit. As far as I can tell, the only thing that they can be sure of is, possibly, inconsistent cervical and lumbar strain up to the point of her becoming pregnant in approximately April or May of 1986. Beyond that point, she was not able to have further diagnostic tests and many of her complaints were probably referable to her pregnancy. In any case, you have not sent me any new medical since her pregnancy which would indicate anything other than the above.
Based on this, and the fact that you have apparently settled now with the primary insurance carrier's $10,000.00 policy limits, you will find enclosed herewith a check made out on behalf of Mrs. Malbrough in the amount of $2,500.00. This amount is hereby tendered to Mrs. Malbrough totally unconditionally. It represents our evaluation, at this time, that Mrs. Malbrough suffered, at most, from lumbar/cervical strain up to approximately May of 1986 or, ten months post-accident.
Hartford has already paid all of the medical bills which this lady has incurred since the date of this accident and therefore owes Mrs. Malbrough no medical specials at this time. Furthermore, the above evaluation indicates ten months of inconsistent pain and suffering. Thus, together with the $10,000.00 which she has already received, this $2,500.00 represents a total general damages figure of $12,500.00 for ten months of "on-again-off-again" complaints of pain.
In June of 1987, the Malbrough's attorney gave Hartford a copy of the CT scan which showed the discs at the L-3 and L-4 levels. In July of 1987, Hartford deposed Dr. Judice and learned that it was his opinion that the lumbar disc bulges were caused by the July 27, 1985 accident.
On August 11, 1987, Hartford had Mrs. Malbrough examined by Dr. Robert Applebaum, a neurosurgeon. Dr. Applebaum gave the following pertinent testimony concerning this examination:
Q. Before you examined Mrs. Malbrough did you have the opportunity to examine any medical reports or other records relative to her prior treatment?
A. Yes, I did.
Q. In general, could you tell the jury what you had an opportunity to examine, in terms of records?
A. I had records from Dr. Judice, from Dr. Richard Whitney, hospital records in regard to admission to Terrebonne General Hospital for a pregnancy in 1982 and a similar admission in 1981, some reports from a Dr. Charles Spence, a general practitioner, and a report from Dr. Gary, who was an orthopedist. And I had also seen some CAT scans of the cervical and lumbar spine performed in 1985, as well as a CAT scan of the lumbar spine performed in March of 1987.
Q. Did you have a chance to review this material before examining Mrs. Malbrough?
A. Yes, I did.
Q. What were Mrs. Malbrough's complaints at the time that you saw her?
A. At the time that I saw her she was complaining of pain in her low back, pain in her neck, and headaches.
Q. What in particular did she relate these complaints to, if anything?
A. She dated her illness to July 26 of 1985 when she had been involved in an automobile accident. She was *443 driving a car and was struck from the left rear by another vehicle. She reported that her car spun around and she was not rendered unconscious but was slightly dazed at that time, and then also reported she noted no significant pain initially.
Q. Did you take a history at that time from Mrs. Malbrough with regard to any neck or back problems at all that she might have had before that car accident?
A. Yes, I did.
Q. And what was her response?
A. She denied any previous difficulty or problems with her neck, back, arms, legs.
Q. Now, did you conduct a physical examination?
A. Yes, I did.
. . . . .
Q. After having examined all of the information that you've mentioned above, did you arrive at any determination as to what might be causing the complaints which Mrs. Malbrough was having?
A. Yes, I did.
Q. And what was that?
A. Well, from the history that she gave me she had sustained injury to her neck and possibly her back in accidents some two years previously, or over two years prior to my exam. I did not feel at the time that I saw her that she had any disease or damage involving her brain, spinal cord or nerve roots. I had also reviewed her CAT scan of the cervical spine which had been performed on August 21 of 1985, less than a month after her accident, and agreed that it was normal. I also reviewed the CAT scan of her lumbar spine which had been performed a few months later, as well as the CAT scan performed in March of 1987, and did see the same spondylitic defect present on the CAT scan which had been present on the plain films, or plain X-rays. There was some minimal bulging on the CAT scans of a similar nature at both the L-3-4 and the L-4-5 levels which had been present on both sets of CAT scans. I did not think there was any evidence of a herniated disk or nerve irritation. And it was my opinion that no surgical treatment or further testing was indicated and I felt she could return to any work for which she was otherwise qualified.
Q. Just so I'm clear on this, when you saw her in August of '87 are you saying thatthat you couldn't find any particular disk problems that might have been accounting for her complaints of pain?
A. That's correct.
Q. Now, you compared the CAT scans from 1985 with those of 1987?
A. Correct.
Q. Was there any significant difference in terms of the disk spaces that you could tell on those two different CAT scans?
A. Not according to my report. I don't have an independent recollection ofof those at this time.
Q. Okay. Your report would indicate what you felt when you put the report together, wouldn't it?
A. Yes.
Q. Would that mean to you that in 1987 the disks appeared to be in reasonably the same condition that they were in 1985?
A. Correct.
Q. Did you ask Mrs. Malbrough when you saw her in August of '87 if she was on any medication for pain or anything else at that time?
A. I usually do. She was on no medication at that particular point in time.
Q. Did you ask Mrs. Malbrough about her employment and when she stopped working?
A. She said she had not worked since December of 1986 and had stopped working due to her pregnancy at *444 that time. She had not resumed working because of her pain in the back.
Q. Diddid she indicate to you that she had stopped working primarily because of the pregnancy or because of neck problems, or one or the other?
A. Because of her pregnancy.
Q. When you saw Mrs. Malbrough in August of 1987 did you see any problem that you felt would indicate that she needed surgery?
A. No.
Q. Did you see any problem in her lower back in August of 1987 that you felt would in any way impair her from working at that time?
A. No.
Q. Do you have any opinion, if any, as to what injuries, based on the records that you were provided with, Mrs. Malbrough might have suffered in the car accident of July '85?
A. Well, assuming the history is correct, she might have sustained a mild concussion. And according to the records she also sustained a cervical strain. Those are the main things I think she may have sustained from reviewing the records.
Q. Doctor, in your experience, does the fact that a CAT scan shows a bulge in the lower back automatically mean that the person having such a bulge would experience pain of some sort?
A. No.
Thus, it is apparent from Dr. Applebaum's testimony that it was his opinion that the bulging lumbar discs were not caused by the July 27, 1985 accident and did not require surgery.
The first jury trial in this case was held on August 25-27, 1987. The first interrogatory submitted to the jury stated "Was plaintiff, Tammy Malbrough, injured in the accident of July 26 [sic], 1985?" The jury, by a vote of 8 to 4, was unable to agree on an answer to this question, and a mistrial was declared.
The majority correctly observes that "We would have had difficulty finding Hartford arbitrary and capricious at this point in view of the conflicting medical testimony." To establish a satisfactory proof of loss of their UM claim against Hartford, the Malbroughs had the burden of proving that Hartford received facts which fully apprised it of, among other things, (1) the causal nexus between the tortfeasors' fault and the damages claimed (concussion, cervical sprain and bulging lumbar discs), and (2) the extent of those damages. McDill v. Utica Mutual Insurance Company, 475 So.2d at 1089. There was a conflict between the expert opinions of Drs. Judice and Applebaum about whether the accident caused the bulging lumbar discs and whether the bulging lumbar discs required surgery. The majority correctly observes that "An insurer should not be cast for penalties and attorney fees simply for exercising its right to litigate a disputed claim."
In May of 1988, Mrs. Malbrough was hospitalized and a lumbar MRI was taken to confirm the lumbar disc bulges at the L-3 and L-4 levels. In June of 1988, Dr. Judice performed a microlaminectomy on Mrs. Malbrough's lumbar discs at the L-3 and L-4 levels. Dr. Judice testified that this surgery confirmed the extent of Mrs. Malbrough's injuries, relieved her symptoms and reinforced his opinion that the accident caused the bulging lumbar discs.
The second jury trial in this case commenced on October 30, 1989. At this trial, Dr. Judice gave the following pertinent testimony on cross-examination:
Q. And then the next CAT scan was done over a year later, about a year and four months later, in early 1987?
A. '87, correct.
Q. So there was a long period of time that went between the two CAT scans, was there not?
A. Correct.
Q. Is it not possible that something in her condition could have changed in the interim?
A. Yes.

*445 Q. She was in fact pregnant during the interim, wasn't she?
A. Correct.
Q. Can pregnancy in and of itself aggravate a bulge?
A. Yes, it can.
Q. Can pregnancy actually cause a bulge?
A. I'd have to say yes.
Q. So a bulge that she may have had there in September of '85 could have been aggravated by the pregnancy of 1986?
A. It could have, yes.
Q. And that's because of the tension that a pregnancy places on a lady's back?
A. Correct.
Q. Now, a CAT scan can't tell you, just looking at it, how old the bulge is, can it?
A. No.
Q. So the bulge that you saw in September of 1985 could have been older than July of 1985?
A. It could have, yes.
Q. If the plaintiff had had other injuries to her back before July of 1985 when she had the car accident, could that have caused the bulge?
A. Yes.
Q. Now, you related the bulge in September of 1985 to the accident because the plaintiff up to that point had not told you of any other pre-accident problems, had she?
A. Correct.
Q. If you had known of any other back injuries or back traumas that might have been sufficient to cause a bulge prior to that July 1985 car accident, would that have changed your opinion at all in September of 1985?
A. If she had had significant back problems in the past and had been treated for a long period of time for her back problems, then I would have had doubt in my mind, yes.
Q. You say if she had had significant problems.
A. Correct.
Q. How significant does trauma have to be to cause a bulge?
A. Well, the trauma can be anything from sneezing to stepping off a curb. It does not have to be significant at all.
Q. In fact, somebody can have a trauma that they don't even recognize as a real trauma and that can cause a bulge, can't it?
A. Yes, that's true.
Q. You say a sneeze could do it?
A. Yes.
Q. Could picking up a heavy water jug do it?
A. Yes.
Q. Could falling to your knees during a basketball game do it?
A. Yes.
Q. Could bending over a baby bed do it?
A. Yes.
. . . . .
Q. When was the first time in this case that Mrs. Malbrough ever complained of pain going into her legs; would that have been in early 1987?
A. Early 1987.
Q. That's correct.
A. Yes.
Q. And that was after she went through 1986 with her pregnancy?
A. Yes, I think she was pregnant in '86. Yes, she was.
Q. She actually had her baby in February of '87?
A. I'm not sure.
Q. She had never complained of any pain going into her legs before early 1987?
A. No.
Q. So that represented some sort of serious indication of nerve problems in her lower back for the first time, did it not?
A. Her symptoms were changing, yes.
Also, at this trial Dr. Applebaum gave the following pertinent testimony:

*446 Q. Okay. Do you have the records there concerning her surgery in June of 1988?
A. I believe so, yes.
Q. Have you had an opportunity to review those records?
A. Yes, I have.
Q. Has your review of any of those more recent records changed your opinions as you've expressed them earlier today?
A. No, they have not.
Thus, after the June 1988 surgery and during the second jury trial there was still a conflict between the expert opinions of Drs. Judice and Applebaum about whether the accident caused the bulging lumbar discs.
The majority gives the following reasons for imposing the sanctions of La.R.S. 22:658 on Hartford:
However, by April 21, 1989, Hartford had received the records of Judice and Terrebonne General Medical Center showing plaintiff had undergone a two-level microlaminectomy to relieve her pain from the bulging disks. At this point Hartford could no longer rely on Applebaum's opinion that plaintiff's bulging disks were "insignificant." Even considering Whitney's 1984 diagnosis of a lumbar disk lesion, Hartford was aware at this point that it owed damages, at a minimum, for aggravation to the extent surgery was required for a pre-existing disk problem. Despite receiving this additional medical information, Hartford made no further tender within 60 days of April 21, 1989.

An assessment that plaintiff's damages were only $12,500.00 at this point was clearly unreasonable. We find that Hartford acted arbitrarily and capriciously in failing to make a further tender to plaintiff within 60 days of April 21, 1989. They are thus liable for penalties and attorney fees under LSA-R.S. 22:658. (Emphasis added)
The majority's rationale only addresses the extent of the damages element; it does not address the causation element. There is no doubt that Mrs. Malbrough had lumbar disc surgery that verified and repaired her bulging lumbar discs. However, the question still remains of whether the accident caused the lumbar disc problems. On this issue there is conflicting expert medical testimony. Hartford had a right to litigate this issue and was not arbitrary, capricious or without probable cause in doing so. The majority is wrong in holding otherwise. Further, and more significantly, if this amount of conflicting testimony is not enough to avoid sanctions under La.R.S. 22:658, how much conflicting testimony is enough?
Hartford presented direct and circumstantial evidence tending to show that Mrs. Malbrough's bulging lumbar discs were not causally connected with the July 27, 1985 accident. For example, it reasonably could be inferred from the facts that Mrs. Malbrough was able to work before and during her pregnancy, but was unable to work after her pregnancy, and did not complain of pain going into her legs before her pregnancy, but did so later, that the pregnancy caused these conditions. Further, Dr. Judice conceded in his testimony, that there were other possible causes of the bulges under the facts of this case. A liberal interpretation of the phrase "arbitrary, capricious and without probable cause" in favor of the insured is required for the majority to find Hartford liable for sanctions under La.R.S. 22:658 under the facts of this case. However, as previously indicated, La.R.S. 22:658 is a penal statute and must be strictly construed in favor of the insurer. The practical effect of the majority holding on this issue is that Hartford litigated the disputed factual issue of causation at its peril. This result is not intended by the statute and constitutes an impermissible chilling of Hartford's constitutional right of access to the courts, as provided for in La. Const. of 1974, art. I, § 22.

The Amount of the Penalty
The Hartford insurance policy provided UM coverage to Mrs. Malbrough with a $100,000 limit of liability. After the $2,500 tender, the balance remaining due under the UM coverage was $97,500.
*447 La.R.S. 22:658 provided, in pertinent part, as follows for determining the amount of a penalty due herein:
All insurers issuing any type of contract... shall pay the amount of any claim due any insured ... within sixty days after receipt of satisfactory proofs of loss from the insured ... Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ... ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount.
The majority have calculated the ten percent penalty in this case as follows:
Thus, the "amount found to be due" is plaintiff's total damages of $283,256.54 less Champion's policy limits of $10,000.00, or $273,256.54. The difference between that figure and the amount tendered of $2,500.00 is $270,756.54. Hartford is thus liable to plaintiff for a penalty of $27,075.65.
The majority has committed error by equating the phrase "the amount found to be due" with Mrs. Malbrough's total damage award of $283,256.54, rather than with the $100,000 amount due under the UM coverage.
As previously indicated, La.R.S. 22:658 is a penal statute and subject to the general rules of statutory interpretation. One of these rules is that the meaning and intent of a statute is to be determined by a consideration of the law in its entirety. When the pertinent portions of La.R.S. 22:658 are considered in their entirety, it is clear that the phrase "the amount found to be due" refers to the amount due under the insurance coverage (or policy), and not the total amount of the damages incurred by the insured. La.R.S. 22:658(A) requires an insurer to pay "the amount of any claim due" within sixty days after receipt of a satisfactory proof of loss. (Emphasis added.) This portion of the statute does not require an insurer to pay any uninsured portion of the insured's loss. La.R.S. 22:658(B)(1) provides that if an insurer fails to make "such payment" (any claim due to the insured) within sixty days after receipt of a satisfactory proof of the (insured) loss, and the failure to pay is arbitrary, capricious or without probable cause, then the insurer is subject to a penalty, "in addition to the amount of the [insured] loss ", of ten percent of the difference between the amount tendered [$2,500] and the amount [of insured loss] found to be due [$100,000]. (Emphasis added.) Thus, when La.R.S. 22:658 was applicable to workers' compensation insurers, it was held that the penalty was only assessed for compensation benefit payments that were, or became, more than 60 days past due; the penalty did not apply to the total amount of the compensation claim. Latiolais v. Home Insurance Co., 454 So.2d 902 (La.App. 3rd Cir.), writ denied, 460 So.2d 610 (La.1984); Basco v. State, Department of Corrections, 335 So.2d 457 (La.App. 1st Cir.), writ denied, 338 So.2d 701 (La.1976). Further, it has been held that the penalty does not apply to the deductible (uninsured) portion of an insured loss. Gagnard v. Travelers Insurance Company, 380 So.2d 191 (La.App. 3rd Cir.1980); Hartel v. Continental Insurance Company, 357 So.2d 55 (La.App. 4th Cir.1978). In McKenzie and Johnson, 15 Louisiana Civil Law Treatise, Insurance Law and Practice, § 131, n. 78, p 48 (1991 Pocket Part) the authors observe that "The penalty is calculated on the principal amount of the claim, exclusive of interest, and it is a one-time penalty, not a per annum calculation." (Emphasis added). Finally, the majority's interpretation of La.R.S. 22:658 is in direct conflict with LaHaye v. Allstate Insurance Company, 570 So.2d 460, 469 (La.App. 3rd Cir.1990), writ denied, 575 So.2d 391 (La. 1991) wherein the Third Circuit observed as follows:
In the case sub judice, Allstate never disputed that LaHaye's home was a total loss, and conceded that the fire was not of a suspicious nature. Despite this and the clear understanding that under Louisiana's Valued Policy Law it was liable *448 for the full amount of coverage for the loss of a dwelling, $175,000, Allstate only paid LaHaye the sum of $141,000 on August 14, 1986. Accordingly, we find that LaHaye is entitled to the twelve percent (12%) penalty on the $34,000 unpaid difference.
See also, Chambers v. North British & Mercantile Insurance Co., 175 So. 95 (La. App. 1st Cir.1937).
Another applicable rule of statutory interpretation is that it is the duty of a court in the interpretation of a law to adopt a construction of the pertinent provision which harmonizes and reconciles it with other provisions. The phrase "in addition to the amount of the loss" obviously refers to the amount of the insured portion of the loss. The insurer has no duty to pay the uninsured portion of the loss under La. R.S. 22:658.[1] Thus, it must follow that when La.R.S. 22:658 refers to "the amount of any claim due any insured", "in addition to the amount of the loss" and "the amount found to be due", it is referring to the insured's claim for the insured portion of the loss. Even if it is asserted that the phrase "the amount found to be due" is ambiguous and subject to two different interpretations, the above interpretation must prevail because La.R.S. 22:658 is a penal statute and must be strictly construed in favor of the insurer.
Finally, the interpretation used by the majority will result in absurd and unjust practical effects. For example, if an insured had $3,000,000 in personal injury damages, and had primary UM coverage of $10,000 and excess UM coverage of $2,000,000, and both UM insurers violated La.R.S. 22:658, then the same penalty of $300,000 would be assessed against the $10,000 primary UM insurer and the $2,000,000 excess UM insurer. It is much more reasonable to believe that the legislature intended to peg the amount of the penalty to the amount of the coverage, rather than to the amount of the insured's damages (insured and uninsured).
If Mrs. Malbrough is entitled to a penalty, it should be 10% of $97,500, or $9,750.

The Amount of the Attorney Fee
Pursuant to La.R.S. 22:658, if an insurer fails to "pay the amount of any claim due" an insured within sixty days after receipt of a satisfactory proof of loss, and the failure is found to be arbitrary, capricious, or without probable cause, then the insurer is liable for "all reasonable attorney fees for prosecution and collection of such amount", with such amount being "ten percent of the difference between the amount paid or tendered and the amount found to be due". The majority has used the following rationale to fix this attorney fee at $90,252.18:
This case was tried twice, each jury trial lasting four days. This litigation also involved numerous depositions, motions, and pleadings. Liability was stipulated, and there were no novel questions of law involved at the trial court level. Plaintiffs' counsel testified his firm does not keep time records, but he estimated the firm spent 225 to 250 hours on the suit. He testified he has never worked for an hourly rate but always charges a 1/3 contingency fee. He obviously achieved a good result for his client.
In light of our reduction of the award to plaintiff and the reversal of the award to Malbrough, the trial court's award of $189,051.08, or approximately 2/3 of the award to plaintiff, is clearly excessive and an abuse of discretion. In our opinion an award of $90,252.18 (1/3 of $270,756.54) for attorney fees is more appropriate and reasonable under the facts of this case. (Footnote omitted)
Attorney fees are subject to review and control by the courts. Leenerts Farms, *449 Inc. v. Rogers, 421 So.2d 216 (La.1982). Rule 1.5 of the Louisiana Rules of Professional Conduct states, in part:
(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) Whether the fee is fixed or contingent.
The Louisiana Rules of Professional Conduct (formerly the Code of Professional Responsibility) have the force and effect of substantive law. City of Baton Rouge v. Stauffer Chemical Company, 500 So.2d 397 (La.1987). The courts may inquire into the reasonableness of an attorney fee. Leenerts Farms, Inc. v. Rogers, 421 So.2d at 219. While it is true that a court must allow the introduction of "all admissible evidence" when an attorney fee is claimed (La.R.S. 13:3738), nevertheless, proof of the value of an attorney's services is not necessary where the services are evident from the record and/or are rendered under the supervision of the court. Richard v. Broussard, 482 So.2d 729 (La.App. 1st Cir. 1985), aff'd, 495 So.2d 1291 (La.1986). A trial court judge has much discretion in fixing an attorney fee, and his award will not be modified on appeal absent a showing of an abuse of discretion. Central Progressive Bank v. Bradley, 506 So.2d 711 (La.App. 1st Cir.), writ denied, 508 So.2d 74 (La.1987); Richard v. Broussard, 482 So.2d at 734.
The majority bases their calculation of the attorney fee, in part, on the total amount of the damage award (insured and uninsured). As previously indicated, this is an erroneous interpretation of the statute, and, thus, wrong as a matter of law. The attorney fee, if it is due, should be calculated on the difference between the tender and the amount found to be due of $97,500, rather than on $270,756.54. Further, the fee fixed by the majority is grossly excessive. A fee of $90,252.18 for approximately 250 hours of work is about $360 per hour. A reasonable attorney fee herein should be 1/3 of $97,500, or $32,175, which equates to about $128 per hour.
For the foregoing reasons, I respectfully dissent in part.
NOTES
[1] Named as defendants in addition to Hartford were Jane S. Wallace, the owner of the other vehicle; Jane's insurer, American Insurance Company; Connye B. Wallace, the adverse driver; and Champion Insurance Company, Connye's insurer. Hartford filed a cross claim against these defendants, which was later voluntarily dismissed.
[2] Tommy Malbrough also claimed damages on behalf of his minor children, Tamala and Tiffany Malbrough, who were passengers in the vehicle operated by their mother at the time of the accident. His claims for their medical expenses and personal injuries were apparently dropped; there was no mention of those claims at trial.
[3] The verdict form asked the jury to express the amount of attorney fees in dollars, but this instruction was ignored.
[4] This sum represents the jury verdict of $568,258.54 less $1,952.00.
[5] This sum represents the sum of $25,000.00 awarded by the jury for loss of consortium less $550.00.
[6] This is illustrated by plaintiffs' counsel's question to Judice during the showing of the film: "Obviously it's Greek to us, but at this point what you're seeing there is abnormal to you as a surgeon?"
[7] We note, however, that plaintiff testified she took maternity leave three to four weeks before each of her other two pregnancies.
[8] Plaintiffs had already settled with Champion for $10,000.00.
[9] The plaintiffs did not answer the appeal and ask for additional attorney fees for the appeal, so we cannot consider the time spent by plaintiffs' counsel defending this appeal.
[1] The statutory interpretation question herein is caused by the fact that Mrs. Malbrough's personal injury losses are greater than the available liability and UM coverages. In most prior decisions surveyed, either the amount of the loss was less than the limits of insurance coverage available (Gagnard), or, even though the personal injury losses were greater than the limits of coverage, judgment was rendered against the UM insurer only for the limits of its coverage (Shepard v. State Farm Mutual Automobile Insurance Company, 545 So.2d 624 (La.App. 4th Cir.), writs denied, 550 So.2d 627, 628 (La.1989).