506 So.2d 780 (1987)
Gerald L. SEXTON and Shirley Sexton
v.
LOUISIANA VACUUM SERVICES, INC., Robert Langlois and Angelina Casualty Company.
No. 86 CA 0181.
Court of Appeal of Louisiana, First Circuit.
April 14, 1987.
*781 Samuel C. Cashio, Maringouin, for plaintiff-appellee Gerald L. Sexton, et ux.
Larry Bankston, Baton Rouge, for defendant-appellant Louisiana Vacuum Services, Inc., et al.
Before LOTTINGER, SHORTESS and CARTER, JJ.
CARTER, Judge.
This is an appeal from a jury verdict awarding $10,705.38 in special damages and $175,000.00 in general damages to Gerald L. Sexton and $10,000.00 in damages for loss of consortium to Shirley Sexton.

FACTS
On June 15, 1984, a 1983 Ford pickup truck, owned and operated by Gerald Sexton, collided head-on with a 1981 Mack truck driven by Robert Langlois and owned by Louisiana Vacuum Services, Inc. The accident occurred on Louisiana Highway 77 between Rosedale and Gross Tete, Louisiana, in Iberville Parish. As a result of this accident, Gerald Sexton sustained various injuries.
Thereafter, the Sextons filed suit for damages against defendants Louisiana Vacuum Services, Inc., Robert Langlois, and Angelina Casualty Company, liability insurer of the Mack truck.
After trial, the jury returned a verdict in favor of the Sextons, awarding Gerald Sexton $10,705.38 in special damages, $175,000.00 in general damages, and awarding Shirley Sexton $10,000.00 for loss of consortium.
From these damage awards, defendants appeal raising the following assignments of error:
1. The jury committed reversible error in awarding $175,000.00 in general damages to Gerald Sexton and in awarding $10,000.00 to Shirley Sexton for loss of consortium.
2. The court erred in failing to grant defendants' motion for new trial or failing to order remittitur.
3. The court erred in overruling the objection by defendants to the introduction of thermograms of Sexton taken approximately one year after the accident.

ASSIGNMENT OF ERROR NO. 1
In this assignment of error, defendants contend that the jury erred in awarding $175,000.00 in general damages to Gerald Sexton and in awarding $10,000.00 for loss of consortium to Shirley Sexton.
We have a constitutional duty to review the law and facts and render a judgment on quantum based on the merits, determining whether the trier of fact abused its "much discretion" that the law accords it in awarding damages. LSA-Const. art. 5, § 10(B); LSA-C.C. art. 1999;[1]Ard v. Samedan Oil Corporation, 483 So.2d 925 (La.1986); Carollo v. Wilson, 353 So.2d 249 (La.1977); Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976). Before an appellate court can disturb an award by a trial court, the record must clearly reflect that the trier of fact abused its discretion in making its award. In the event the appellate court finds from the record an abuse of discretion, the award may be disturbed by lowering (or raising) it to the highest (or lowest) point which is reasonably within the discretion afforded the trier of fact. Ard v. Samedan Oil Corporation, supra; Reck v. Stevens, 373 So.2d 498 (La.1979); Carollo v. Wilson, *782 supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
Accordingly, in the instant case, we must first examine the record to determine whether it reveals that the trial court abused its discretion in its awards to Gerald and Shirley Sexton. If we find an abuse of discretion, the awards should be reduced to the maximum amounts which are reasonably within the discretion of the trial court.

A. $175,000.00 General Damage Award
In his petition, Gerald Sexton itemized many injuries he allegedly suffered as a result of the accident including: cervical and lumbar strain; contusions of the right chest, right lung, right shoulder, spleen and heart; several rib fractures; fracture of the spinous process of the scapula; lacerations to the face and neck; and severe damage to the mouth and teeth. Sexton further alleged that he continues to suffer "constant, severe, excruciating pains with resulting nervousness and anxieties, all of which will continue during his lifetime."
Dr. D.V. Cacioppo, who initially treated Sexton, testified that on the day of the accident Sexton was complaining of severe pain in the chest and upper abdomen. An examination revealed tenderness in both the rib cage and abdomen, pain over the right scapula, normal blood pressure and minor lacerations of the neck and lower lip. He also testified that Sexton was alert and cooperative at this initial examination. When questioned about his report, the following testimony was elicited:
Q. Now you indicate here that he had no evidence of pneumothorax. What do you mean by that?
A. Sometime when people have chest injuries and broken ribs, one of the sharp edges of the rib can injure the lung. And as a result of that, air can leak out of the lung into the chest cavity around the lung. And this air can cause the lung to collapse, depending on how much air is present. And that's what pneumo-thorax (sic), just means air in chest cavity.
Q. Well, did youon the report as I read ityou found that there was a contusion of the right lung?
A. Yes.
Q. What does that entail, what does that mean?
A. That means that there has been some bruising of the lung tissue as a result of the trauma of the accident. And just like you can bruise your arm and you will get swelling and some hemorrhaging into the tissues, the same thing happens to the lung.
Q. In order to and in your experience, it takes quite an impact to cause a contusion of the lung, doesn't it?
A. It does take considerable trauma or impact to fracture ribs and contuse a lung.
Q. What about the right scapula and his shoulder? Did you find that he had any problem with the right scapula, that is, the spinal process of the right scapula and his right shoulder?
A. Yes, the scapula is a bone that is commonly called a "wing-bone". And, it has a ridge on the surface of it, and this was fractured. As far asThis would indicate that there was considerable trauma. It would take a heavy blow to fracture that particular bone. He had some bruising around his right shoulder and some pain in the shoulder on movement.
Q. What about the spleen? Did you find any problem there? Was there a hematoma present?
A. He was complaining of considerable pain and tenderness in the upper abdomen. When a patient complains of this after an accident where the chest has been injured, you are very concerned about injury to the liver or the spleen. The spleen is an organ that's under the rib cage on the left side. The liver is under the rib cage on the right side. In order to try to determine if he had injury to either one of these organs, we had a specialized kind of x-ray called the "cat-scan" to take a picture of that area. This did not show any injury to the liver, but it showed a *783 small area at the upper portion of the spleen where the radiologist interpretted (sic) this as being a hemotoma or a small hemorrhage in the upper portion of the spleen along the upper surface of the spleen.
Q. Well, according to your report, you indicate here that there was a contusion of the spleen. Is that what you mean?
A. Yes.
Dr. Cacioppo testified that when he saw Sexton approximately one year later, Sexton still complained of pain in the chest, abdomen and shoulder. Dr. Cacioppo concluded that Sexton had some disability as evidenced by the pain in his chest and felt this pain could interfere with his lifting or engaging in strenuous activity.
Dr. Robert C. McReynolds, Jr., a board certified radiologist, testified that there were fractures to the right eighth, ninth, tenth, and possibly the twelfth ribs. He also found a fracture of the scapula or shoulder blade. His analysis of a CT-scan indicated no injury to the spleen. A report signed by Dr. McReynolds indicated there was no evidence of a pneumothorax. However, while testifying, Dr. McReynolds acknowledged a collapse of the lower lobe of the right lung. In the same report, he noted that there was no abnormality of the liver, spleen or pancreas.
At trial, Dr. James F. Woodard, an expert in internal medicine and cardiology, testified. Although Dr. Woodard had treated Sexton for a past heart attack and cardiovascular disease, he opined that Sexton's current complaints of chest pains were "non cardiogenic in origin and more related to musculoskeletal trauma from his accident."
On July 18, 1984, one month after the accident, Sexton was examined by Dr. Larry D. LeCour, Jr., an expert in general dentistry. Dr. LeCour testified that:
[T]he diagnosis was very difficult to be made at that time. I wasn't sure of the diagnosis. I examined him carefully. We took x-rays of the teeth that were present, evaluated the results of the injury, and took under advisement the situation so that a diagnosis could be made. I saw that the teeth did not fit together properly. He was not able to chew. He was not able to close his teeth in their proper contact.
Dr. LeCour worked on Sexton's teeth for approximately five months and concluded that, "although the upper left side is not as solid as it once was, he's reasonably functional considering what we have to work with."
Dr. Alvin Stander, an orthopedic surgeon, saw Sexton on October 8, 1984. At that time, Sexton's only complaint was pain in his right shoulder. Dr. Stander found a fracture of the acromion process of the scapula, which he stated would require excision, if there was sufficient difficulty and trouble to justify such a procedure. However, Dr. Stander opined that the fracture was not in the shoulder joint and should not cause Sexton any difficulty.
Dr. Anthony J. Collett, Jr., a urologist and expert in the surgical aspect of the urinary tract, stated that Sexton came to him October 8, 1984, approximately four months after the accident, complaining of frequent urination and other disabilities. Dr. Collett testified that, in his opinion, there was no relationship between Sexton's diagnosed prostate problem and the automobile accident.
In addition to the medical testimony, Sexton and several witnesses attested that his lifestyle had significantly changed due to the pain the injuries caused him. Testimony generally indicated that Sexton's temper was much shorter due to his constant pain. Sexton now has little desire to socialize or continue the close relationship he once had with his grandchildren.
Taking the record as a whole and after analyzing the facts and circumstances peculiar to this case, we find from the testimony presented that the jury award of $175,000.00 in general damages is high but not so excessive as to be an abuse of the jury's much discretion. The testimony which the jury could accept established several rib fractures, a scapula fracture, injury to the spleen, a pneumothorax, lacerations *784 of the neck and lower lip, broken teeth, and the necessity of a new upper bridge and root canal. Dr. Cacioppo was of the opinion that Sexton had some disability that would interfere with his lifting or engaging in strenuous activity. Also the evidence showed that plaintiff was apparently not as active as he used to be with social activities and in activities involving his family.
Thus, we feel the jury award, although generous, is not an abuse of the jury's much discretion.

B. $10,000.00 Award for Loss of Consortium
The trial court awarded Shirley Sexton $10,000.00 in damages for loss of consortium under the 1982 amendment to LSA-C.C. art. 2315, which provides:
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.
In Finley v. Bass, 478 So.2d 608 (La.App. 2nd Cir.1985), the court broke down the concept of "consortium" into the following aspects: loss of love and affection; loss of society and companionship; loss of sexual relations; loss of performance of material services; loss of support from the spouse; and loss of aid and assistance.
Although we do not feel that Shirley Sexton proved that she was entitled to damages from every category listed above, we feel that the jury was not manifestly erroneous in awarding her $10,000.00 for the damages proven at trial.
She testified that after his nine-day hospital stay, her husband could not take care of himself at all. She was responsible for giving him his medication and baths, and performing the duties of a full-time registered nurse. Gerald Sexton found sleeping in a bed uncomfortable, so he would sleep sitting up in a chair. Shirley Sexton would become tense and nervous, fearing he would fall forward and reinjure himself, so she would stay awake during the night.
Their social life declined drastically as he had no desire to leave the house and socialize. She also testified that after the accident they had no marital relations, as he was always in pain.
The trial court has great discretion to assess damages that cannot be calculated with certainty. LSA-C.C. art. 1999. The formulation of damages is enhanced by personal observation of the parties' demeanor. We will not adjust the award unless there is an obvious abuse of discretion. Finley v. Bass, supra.
Thus, we find that the jury did not abuse its discretion in awarding $10,000.00 in damages for loss of consortium to Shirley Sexton.

ASSIGNMENT OF ERROR NO. 3
Defendants contend that the trial court erred in overruling the objection to the introduction of thermograms of Sexton, taken approximately one year after the accident.
The trial judge excused the jury and heard arguments regarding the objection. Defendants objected to the introduction of the thermograms on the basis that there was no medical reason for their introduction. Defendants contend that the thermograms sought to be introduced did not reflect prior problems with Sexton's face, chest and shoulder and that the probative effect on the jury would not outweigh the prejudicial effect on the jury. The trial judge, however, permitted the introduction of the thermograms.
Dr. Masako Wakabayashi qualified as an expert in thermology and radiology. She testified that:
Thermography is just that measurement of the heat emission pattern from the body. And as you can see, the human being, if you cut the body in the midline, right and left about same. If you have some difference from right to left, you have to have some explanation. And, that is essential to move thermography. If right side and left side have difference of temperature, there should be some explanation. That's what it is.
*785 Dr. Wakabayashi testified generally as to various heat emissions and colorations and what each signified. However, Dr. Wakabayashi did not testify as to any cause of particular heat emissions or colorations.
Therefore, we cannot say that the introduction of the thermograms and their explanation by the expert were more prejudicial than probative in value. Nor can we say that the trial court committed manifest error in allowing the thermograms into evidence. We find this assignment lacks merit.

ASSIGNMENT OF ERROR NO. 2
Because of our ruling in Assignment of Error No. 1, we find it unnecessary to address the issues raised in Assignment of Error No. 2.

CONCLUSION
For the reasons expressed above, the judgment of the trial court is affirmed. Costs of this appeal are assessed against defendants.
AFFIRMED.
NOTES
[1] Formerly LSA-C.C. art. 1934(3) (1870).