604 So.2d 1336 (1992)
Clara M. EPPS, et al.
v.
CITY OF BATON ROUGE, et al.
No. CA 91 0599.
Court of Appeal of Louisiana, First Circuit.
June 29, 1992.
As Clarified on Limited Grant of Rehearing September 4, 1992.
*1338 Cyrus J. Greco, Baton Rouge, for plaintiff-appellant Dan Epps, Jr., Individually.
Lennie F. Perez, Baton Rouge, for plaintiffs-appellants Sharon Ann Gallerson and Darryl Leon Gallerson.
Frank J. Gremillion, Baton Rouge, for defendant-appellant City of Baton Rouge, EBRP.
John S. Thibaut, Jr., Baton Rouge, for defendant-appellant Royal Insurance Company.
James E. Moore, John S. Thibaut, Jr., Baton Rouge, for defendant-appellant Juanita Thomas.
Before COVINGTON, C.J., and LEBLANC and WHIPPLE, JJ.
WHIPPLE, Judge.
This is an appeal by all parties from a judgment in favor of the plaintiffs, the surviving spouse and children of Clara M. Epps,[1] who was involved in an automobile *1339 accident with Juanita L. Thomas. The defendants are Thomas, her insurer, Royal Insurance Company, and the City of Baton Rouge/Parish of East Baton Rouge ("City/Parish").
Three years and three months prior to the accident, Mrs. Epps had been diagnosed with chronic myelogenous leukemia, an ultimately fatal illness which inexplicably progresses to the acute or blastic stage in an average of three to four years after diagnosis. Although three to four years is average, persons with the disease have been known to survive for twenty years or more. Death generally occurs three to six months after the disease enters the acute stage.
Until the date of the accident, Mrs. Epps led a full and active life, working full time and engaging in her usual social activities. After the accident, she underwent a profound change in health and soon died. The trial court found that the accident accelerated but did not cause Mrs. Epps' death and awarded total damages of $376,408.88, including funeral expenses, on the basis of plaintiffs' survival action. The court made no award for wrongful death.
The judgment against Royal was limited to its $10,000 policy limits, but the court also cast it in judgment for interest on the entire amount of the judgment rendered against Thomas. Royal defended the suit at trial but now contends that the unconditional pretrial tender of its policy limits, including interest on the policy limits, relieved Royal of further liability.
This case presents a close question of causation regarding the effect of the accident on Mrs. Epps' untimely demise and the appropriate measure of damages. Other issues raised on appeal involve allocation of fault and the extent of an insurer's liability for pre-judgment interest where it unconditionally tenders policy limits before trial.

FACTS AND PROCEDURAL HISTORY
This case arises from an accident which occurred on August 15, 1986, at the intersection of Scenic Highway and North Street in Baton Rouge. At the intersection, North Street is a one-way street, with two lanes for westbound traffic only. Scenic Highway is a two-way, two-lane street accommodating both northbound and southbound traffic. Prior to the accident, Juanita Thomas was driving eastbound on North Street approaching Scenic Highway, and was travelling in the wrong direction on the one-way street. Prior to impact, Mrs. Clara Epps was proceeding northbound on Scenic Highway, approaching its intersection with North Street. Facing a green light in the semaphore which controlled the intersection, Mrs. Epps properly entered the intersection.
At trial, Thomas testified that she did not realize that North Street was a one-way street, or that she was driving the wrong way, until it was too late to avoid the accident. Thomas had turned left onto North Street from North 20th Street, a short block to the west of Scenic Highway, where North 20th Street and North Street form a T-intersection. At the T-intersection, however, there were no signs indicating that North Street was a one-way street. Apparently, the proper signs had been missing for some time, although a crew from the City/Parish Department of Public Works had replaced a stop sign at the location on June 24, 1986.
Mrs. Epps was 45 years old at the time of the accident and had been diagnosed with chronic myelogenous leukemia since May of 1983, at which time her anticipated life span was four years. Chronic myelogenous leukemia usually progresses in three stages as follows: 1) during the chronic stage, which typically lasts three to four years but may last much longer, the patient can function in a relatively normal fashion; 2) during the acceleration stage, which lasts six months or less, the production of cancerous blood cells by the body greatly increases; and 3) during the acute or blastic stage, which lasts three months or less, the patient's overall health quickly deteriorates and death occurs.
As established at trial, chronic myelogenous leukemia patients are able to lead normal lives while the disease remains in the chronic stage. To the casual observer, *1340 Mrs. Epps did not appear to be sick prior to the accident; nevertheless, she was terminally ill. She apparently suffered only minor injuries in the accident but began experiencing pain immediately following the accident.[2] Within an hour, her oldest daughter took her to Baton Rouge General Medical Center.
In the emergency room, Mrs. Epps had a fever of 101.7 degrees Fahrenheit and complained of pain in her left side, mid back, and left arm. She was admitted to the hospital for further evaluation and remained there from August 15, 1986 (the date of the accident) until August 20, 1986, when a bone marrow test was performed. The results showed that her chronic myelogenous leukemia was not in the acute or blastic stage[3] at that time, but she was tender in the area of the spleen, which appeared to be enlarged.
Mrs. Epps' spleen had become enlarged before because of the disease but was reduced to a normal size through chemotherapy. Dr. Henry W. Giles, her treating physician, had examined her on June 25, 1986, and reported no splenomegaly, or enlargement of the spleen. Although splenomegaly is a symptom of chronic myelogenous leukemia, Dr. Giles was concerned about possible trauma to the spleen because of the accident and Mrs. Epps' complaints of pain. He then consulted with Dr. Joseph B. Dupont, Jr., a general surgeon, about the feasibility and need for a splenectomy, or surgical removal of the spleen.
Splenectomies are not known to affect the progression of chronic myelogenous leukemia to the acute stage but are performed in unusual cases, where extreme pain or an undue risk of rupture of the spleen is present. Mrs. Epps, however, subjectively feared a splenectomy because she thought it would adversely affect her health. She read medical texts on her condition and became concerned about her ability to endure physical trauma and the loss of her spleen. At trial, Dr. Giles described her as an inquisitive worrier but explained that his concern at the time was her platelet count. He had instructed Mrs. Epps to tell him if she had any bruises because that might indicate a low platelet count.
Mrs. Epps returned to the hospital on August 24, 1986, with fever, increased pain, and increased splenomegaly. On August 27, 1986, Dr. Dupont performed a splenectomy. He noted that Mrs. Epps had gross hepatosplenomegaly, enlargement of the liver as well as the spleen. A biopsy of the liver revealed that the disease had begun to affect that organ as well. After recuperating from the splenectomy, Mrs. Epps was released from the hospital on August 31, 1986.
Dr. Dupont testified that trauma to the spleen was one of the things he was looking for but determined that there was no evidence of traumatic injury or laceration of the spleen at all. The spleen pathology showed extramedullary hematopoiesis with areas of necrosis and hemorrhage; the liver showed extramedullary hematopoiesis and subcapsular fibrosis. Dr. Dupont related these pathologies, or abnormalities, to the disease rather than to the accident. However, Dr. Giles, the treating oncologist, related the spleen pathologies to the accident.
On October 19, 1986, because of continued fever and nausea, Mrs. Epps was again admitted to the hospital. She was still experiencing abdominal pain after the splenectomy and had lost weight. On October 23, 1986, another bone marrow test was done. The results showed a diffuse myelofibrosis with numerous immature forms; increased megakaryocytes, compatible with a myeloproliferative disorder; and increased blasts or cancer cells. Dr. Giles said these findings indicated a progression into the accelerated phase of chronic myelogenous leukemia and that Mrs. Epps had *1341 developed fibrosis, which is a reaction to leukemic cells in the bone marrow. According to Dr. Giles, this represented a definite change in the condition of her bone marrow from the sample obtained immediately following the accident.
On October 25, 1986, Mrs. Epps was released from the hospital, at which time Dr. Giles noted that her prognosis was guarded. The diagnosis upon discharge reflected that her chronic myelogenous leukemia had entered a more advanced stage. She returned to the hospital on November 26, 1986, with a blastic relapse, but was released the same day after receiving a blood transfusion.
Mrs. Epps was admitted to the hospital in a noncommunicative state on December 19, 1986. She was able to go home on December 24, 1986, but again became unresponsive and was readmitted on December 26, 1986. As the disease progressed to the acute or blastic stage, her overall health began to deteriorate. She remained in the hospital until January 20, 1987, only to return on January 25, 1987, by which time she had become paraplegic. Mrs. Epps went home for the last time on February 5, 1987, but returned the next day to the hospital, where she remained until she died on February 15, 1987.
Mr. and Mrs. Epps initially filed a petition for damages on December 19, 1986, prior to Mrs. Epps' death. The petition named as defendants the City/Parish and Royal Insurance Company and included a claim for loss of consortium. Two supplemental and amending petitions were filed after Mrs. Epps' death. The first was filed on February 8, 1988, by Sharon and Darryl Gallerson, Mrs. Epps' children from a previous marriage. The second amending petition was filed on February 11, 1988, by Mr. Dan Epps, Jr., individually and on behalf of his (then) minor daughter, Demetra Epps. Both supplemental and amending petitions added claims for survival and wrongful death damages and also added Juanita L. Thomas as a defendant. The matter went to trial on April 30, 1990.
At trial, three doctors testified regarding the effect of the accident on the progression of chronic myelogenous leukemia in Mrs. Epps. All three doctors stated that the etiology of leukemia progressing from one stage to another is unknown but gave varying opinions on the issue of causation.
Dr. Giles, the treating oncologist, testified that it was a mere possibility that the trauma suffered in the accident caused Mrs. Epps' leukemia to rapidly develop into blastic crisis. He said it was equally possible that it was a coincidence and that both were reasonable possibilities. In his opinion, Mrs. Epps' life expectancy at the time she was first diagnosed with leukemia was less than the average because her spleen had already become swollen. Dr. Giles is board certified in internal medicine and limits his practice to internal medicine, oncology, and hematology. At the time of trial, he had been practicing oncology for twenty-two years.
Dr. Lee Roy Morgan also testified for the plaintiffs. He is an oncologist specializing in cancer chemotherapy and devotes seventy-five percent of his time to research. Dr. Morgan has given lectures in medical oncology as a joint professor of medicine at L.S.U. and has been treating cancer patients since 1975. He is a well published author in the field of cancer research.
Although there is no general agreement among medical experts as to the cause of the progression of chronic myelogenous leukemia into the acute phase, Dr. Morgan testified that the external stress experienced by Mrs. Epps explains the change in the course of her leukemia and why it occurred immediately following the accident, rather than at a later time. Dr. Morgan noted that had the accident not occurred, Mrs. Epps would have died anyway, but he could not say when. Given the history of the accident, the splenectomy, and the change in Mrs. Epps' personality following the accident, Dr. Morgan opined that in his experience, this was sufficient emotional or psychological stress to weaken her immune system and allow a blastic crisis to occur.
Dr. Morgan testified that the hormonal influence of such negative stress impedes *1342 the proliferation of normal white blood cells thereby weakening the immune system. He explained that if the immune system is what kept her leukemia in check, and if her immune system was weakened by the traumatic events related to the accident, such a weakening would allow the leukemia to degenerate into an acute phase. He noted that because the etiology of chronic myelogenous leukemia entering the acute or blastic phase is unknown, Mrs. Epps could have gone into a blastic crisis when she did had the accident not occurred. Dr. Morgan testified, however, that it was more probable than not that the accident precipitated Mrs. Epps' blastic crisis. When asked whether he meant forty-nine percent or fifty-one percent probability, Dr. Morgan replied: "Fifty-one percent probability that this is what precipitated it."
Dr. Gerald P. Miletello testified for the defense. He is an internist/oncologist who had been in private practice for five years at the time of trial. Following his internship and residency, Dr. Miletello did a two-year fellowship in oncology. His opinion was also based upon a review of Mrs. Epps' medical records. He testified that there was no causal connection between the accident and Mrs. Epps' death or between the accident and the transformation of her chronic myelogenous leukemia from the chronic to the acute stage.
Dr. Miletello conceded that stress plays a role in any illness but declined to attach any significance to the relationship between stress or physical trauma and the change in the course of Mrs. Epps' disease. He maintained that at present, there exists no objective data to support Dr. Morgan's theory that stress could have effected a change in the course of Mrs. Epps' leukemia. Dr. Miletello agreed that stress might weaken the immune system; however, it would be impossible to prove because stress affects some people differently than others. He conceded the possibility of stress causing a change in the course of chronic myelogenous leukemia but stated that it was speculation, adding that it makes little sense to speak of the effect of stress on the immune system because the disease itself destroys the immune system.
At the conclusion of the trial, the court found Thomas and the City/Parish each fifty percent at fault in causing the accident and awarded $300,000.00 for general damages; $65,802.00 for medical expenses; $5,944.00 for loss of wages; and $4,662.88 for funeral expenses. The court awarded these sums based upon plaintiffs' survival action. The trial court denied recovery for Mrs. Epps' wrongful death, finding that the accident accelerated but did not cause her death. Although the court made an award to Dan Epps, Jr. for the survivorship claim, his claim for loss of consortium was not mentioned in the court's written reasons for judgment.
Prior to trial, Royal deposited the sum of $13,742.53 in the registry of the court, which represented Royal's $10,000.00 policy limits plus accrued interest on that amount from date of judicial demand, until tendered. The court limited its judgment against Royal to $10,000.00 plus payment of all interest for which Thomas was cast in judgment, from the date of judicial demand until the date of tender, subject to a credit for the amount deposited in the registry of the court.
Plaintiffs and defendants appeal. Plaintiffs Sharon and Darryl Gallerson assign error to the trial court's failure to award damages for wrongful death. Plaintiffs Demetra and Dan Epps, Jr. assign error to the trial court's failure to award damages for loss of consortium to Dan Epps, Jr., as well as the failure to award damages for wrongful death.
Defendants Thomas and Royal assign as error the action by the trial court in allocating fifty percent fault to Thomas and only fifty percent fault to the City/Parish; the finding that the accident caused the accelerated death of Mrs. Epps; the award of an excessive amount of general damages; the award of special damages when those damages were not proven; and the failure to find that Royal's tender of its policy limits plus interest prior to trial relieved Royal of further liability to the plaintiffs.
Defendant City/Parish alleges that the trial court erred in finding that the accident *1343 accelerated Mrs. Epps' death; in finding a causal relationship between the accident and Mrs. Epps' death; in awarding $300,000.00 for Mrs. Epps' pain and suffering; and in ruling that plaintiffs proved their case by simply proving a possibility of a relationship between the accident and Mrs. Epps' death rather than requiring the plaintiffs to prove their claim by a preponderance of the evidence, or that Mrs. Epps' death was more probably than not accelerated by the accident.

CAUSATION
The most difficult issue raised by the various appeals filed herein is the question of causation.
Defendants assign error to the finding by the trial court that the injuries suffered by Mrs. Epps in the accident accelerated her death. The City/Parish contends that the court erred in concluding that the plaintiffs proved their case by simply proving the possibility of such a relationship. All defendants argue that the trial court applied the wrong law regarding burden of proof. We agree.
The trial court concluded that the accident accelerated but did not cause the death of Mrs. Epps. In deciding the issue of causation, the trial court apparently applied the "reasonable possibility" test discussed in Wisner v. Illinois Central Gulf Railroad, 537 So.2d 740 (La.App. 1st Cir. 1988), writ denied, 540 So.2d 342 (La.1989). The "reasonable possibility" test for causal relation establishes a presumption of causation where the following facts have been proven: good health prior to the accident and medical testimony showing a reasonable possibility that the accident caused the injury. Wisner, 537 So.2d at 745. In its reasons for judgment, the court in the instant case expressed doubt whether plaintiffs could avail themselves of this presumption; however, it enunciated the question to be decided as "whether plaintiffs have shown by a preponderance of the evidence that there is a reasonable possibility that the accident caused Mrs. Epps' injuries."
Based upon the record in this case, we find that the plaintiffs are not entitled to benefit from the evidentiary presumption because Mrs. Epps clearly was not in "good health" prior to the accident, irrespective of how she appeared to others. The fact is that she was terminally ill. Thus, the trial court erred in applying the Wisner "reasonable possibility" test to the facts of this case. The proper burden of proof is whether plaintiffs have proven more probably than not that the accident aggravated a preexisting terminal condition; that is, whether the accident caused Mrs. Epps to die sooner and/or to experience pain and suffering and mental anguish to a greater extent than she would have had the accident not occurred.
Because the trial court's legal error in this case has interdicted its finding on causation, the manifest error standard no longer applies. It is therefore our duty to determine de novo whether plaintiffs have proven causation based upon our review of the entire record. See Rosell v. ESCO, 549 So.2d 840, 844 n. 2 (La.1989); ODECO Oil and Gas Company v. Nunez, 532 So.2d 453, 458 (La.App. 1st Cir.1988), writ denied, 535 So.2d 745 (La.1989).
Defendants contend that because the etiology of the transformation of chronic myelogenous leukemia to the acute stage is unknown to medical science, the opinion that the accident caused such a transformation is patently unsound. They also argue that the opinion of Dr. Morgan is internally inconsistent because he agrees that the causes of blastic crises in chronic myelogenous leukemia patients are unknown, yet opined that the cause of Mrs. Epps' blastic crisis was a stress-weakened immune system. The defendants maintain that it was to be expected that Mrs. Epps would enter the blastic stage of chronic myelogenous leukemia when she did and that it was merely a coincidence that this occurred soon after the accident.
Based on our independent review, we conclude, more probably than not, that the accident hastened Mrs. Epps' death. Even though only one out of three experts testifying on this issue said that it was more *1344 probable than not that the accident caused the fatal change in the course of Mrs. Epps' chronic myelogenous leukemia, the other two doctors who testified could not dismiss that possibility. Circumstantial evidence of causation must also be considered, including the extensive testimony from the decedent's children and other close family members which detailed the close temporal relationship between the accident and the abrupt onset of physical symptoms of the progression of Mrs. Epps' illness.
The evidence further shows that after the accident, and especially after her splenectomy, Mrs. Epps' once cheerful disposition changed for the worse. Before the accident, Mrs. Epps at least had the hope of surviving longer than she did. After the accident, the onset of symptoms characterizing the more advanced stages of her disease meant that she would soon die. We conclude from the record that Mrs. Epps suffered physical and mental pain to a greater extent than she would have absent the accident.
While the issue of causation is a close question in this case, we conclude that plaintiffs have proven that the accident hastened but did not directly cause Mrs. Epps' death. Accordingly, while the trial court correctly denied damages for wrongful death, we conclude that Mrs. Epps suffered both physically and mentally to a greater extent than she would have had the accident not occurred.
These assignments of error lack merit.

ALLOCATION OF FAULT
Defendants Thomas and Royal allege that the allocation of fault by the trial court was manifestly erroneous because the accident would not have happened but for the negligence of the City/Parish. They argue that the fault of the City/Parish involved an awareness of the danger created and that the fault of Thomas did not. Thomas and Royal contend that the intersection where the collision occurred was not visible from Thomas' perspective. Thus, she should have been assigned a much lesser degree of fault.
In their capacity as appellees, Dan and Demetra Epps maintain that the trial court was not manifestly erroneous because there was a reasonable factual basis for the allocation of fault. The Eppses note that Louisiana does not follow the "but for" theory of causation whereby there can be only one cause. They list several facts adduced at trial which they contend support the trial court's finding that Thomas failed to see what she should have seen.
Allocation of fault is a factual finding subject to the manifest error-clearly wrong standard of review. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La.1985). The relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. Watson, 469 So.2d at 974.
In finding Thomas and the City/Parish equally at fault, the trial court noted that the City/Parish had constructive knowledge of the absence of proper traffic control signs and failed to replace missing traffic signs which had been down for an extended period of time. Thomas' fault was based on her failure to see Mrs. Epps' vehicle and on her failure to observe that she was entering an intersection controlled by traffic lights, and was facing the wrong side of the lights. The trial court also found that Thomas' failure to slow down in the face of oncoming traffic constituted negligence.
It is apparent from Thomas' testimony that she was inattentive because she was looking for her doctor's office when the accident occurred. While she would not have faced the predicament she did but for the City/Parish's negligence, her independent negligence was also directly related to the harm suffered by Mrs. Epps. Under these circumstances, we do not find the trial court's allocation of fault between the defendants to be manifestly erroneous or clearly wrong.
This assignment of error also lacks merit.

*1345 QUANTUM

General Damages
Having determined that plaintiffs have proven causation and that the trial court was not manifestly erroneous in its allocation of fault, we now address the question of damages. The trial court stated the following reasons for its award of damages in this case:
... In view of the pain and suffering over the six month period that Mrs. Epps underwent and the fact that this Court has found that the accident caused an acceleration of her death, the Court believes, based on the jurisprudence cited by counsel for the plaintiff, that an award of $300,000.00 will adequately compensate the plaintiffs in this case for the survival action which they have filed.
Having found the question of causation tilted every [sic] so slightly in favor of the plaintiffs, the Court must further conclude that on the issue of special damages an award must be made of $65,802.00 for medical payments, of $4,662.88 for funeral expenses and of $5,944.00 for lost wages, all of which the Court believes were proven by a preponderance of the evidence on the trial of this case.
Because the Court believes that Mrs. Epps would have died within a reasonable time even had she not had this accident, the Court makes no award for wrongful death in this case ...
Defendants contend the trial court erred in awarding an excessive amount for general damages, yet their argument on this point is primarily based upon their contention that there is no causal relationship between the accident and the aggravation of Mrs. Epps' illness. They maintain that the plaintiffs have proven no more than minor bumps and bruises to Mrs. Epps. Alternatively, defendants argue that even if there was a causal connection between the accident and Mrs. Epps' development of the acute stage of leukemia, $300,000.00 is still excessive because Mrs. Epps endured what every chronic myelogenous leukemia patient endures, sooner or later. Plaintiffs, on the other hand, contend the trial court's award of damages was not an abuse of discretion. Plaintiffs maintain that the evidence and prior jurisprudence fully support the award for general damages in this case.
Before a damage award may be questioned as inadequate or excessive, the appellate court must look to the individual circumstances of the particular case to determine whether the award was a clear abuse of the trier of fact's great discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). Only after an articulated analysis of the facts discloses an abuse of discretion may an award be considered either inadequate or excessive. Reck, 373 So.2d at 501. Where the defendant's negligent conduct aggravates a preexisting injury or condition, he must compensate the victim for the full extent of her aggravation. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429 (La. 1991).
Prior awards under similar circumstances may serve as a general guide in determining whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. Litton v. Ford Motor Company, 554 So.2d 99 (La.App. 2nd Cir.1989), writ denied, 559 So.2d 1353 (La.1990). However, absent an initial determination that the trial court abused its great discretion in awarding general damages, the reviewing court should not disturb the award. Reck, 373 So.2d at 501; Valentine v. Wells, 540 So.2d 344 (La.App. 1st Cir.1988), writ denied, 546 So.2d 178 (La.1989).
The facts and circumstances of the instant case show that because of a preexisting illness, the pain and stiffness Mrs. Epps suffered immediately after the accident soon progressed to a state of paraplegia and eventual death, even though the accident did not directly cause death. Mrs. Epps not only endured physical pain, she also experienced severe emotional pain. Mrs. Epps cried often because she reasonably and sincerely believed that her symptoms and the effects of the accident foreshadowed her death. One of her sisters, Gloria Shields, testified that she was reluctant *1346 to call or visit Clara because she was always crying after the accident.
The testimony of family members shows that prior to the accident, Mrs. Epps was a cheerful individual even though she had a fatal illness. She was able to work full time and engage in her usual activities with no apparent distress. Her ability to function within the family unit was so extensive that her thirteen year old child was not aware that her mother had leukemia until after her death. Following the accident, Mrs. Epps' personality and appearance changed for the worse. She spent a great amount of time in the hospital and could not engage in any of her former activities.
In reviewing the general damage award, we must realize that sooner or later, Mrs. Epps would have suffered and died in much the same manner as she did, whether or not she was involved in a traffic accident. On the other hand, she lost an indeterminable amount of life span and an equally indeterminable loss of enjoyment of life. Also, her mental anguish was greater simply because a traumatic event precipitated her blastic crisis.
After careful review of the facts and circumstances peculiar to this case and this individual, we conclude that the award of $300,000.00 constitutes an abuse of the trial court's discretion. We must keep in mind that the general damage award in this case is for the compensation of only six months of suffering, not for wrongful death. While the evidence shows that Mrs. Epps suffered extensive physical and emotional pain, the record does not support the award made by the trial court, considering her medical condition at the time of the accident, and her death six months after the accident.
Having determined that the trial court's award of general damages was an abuse of its great discretion, we now resort to prior awards to determine what would be an appropriate award for the present case. Reck, 373 So.2d at 501. Our duty in this regard is to lower the award to the highest point which is reasonably within the trial court's discretion.[4]Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
The Supreme Court upheld a general damage award of $225,000.00 in Lee v. Missouri Pacific Railroad Company, 540 So.2d 287 (La.1989). Lee involved a collision between a train and a pickup truck in which the motorist suffered a ruptured spleen, requiring a splenectomy combined with an exploratory laparotomy to detect any other possible internal injuries. Besides the damage to and loss of his spleen, however, Mr. Lee had multiple fractures in his right hip, four broken ribs, and multiple abrasions and contusions.
In Seaux v. Domingue, 509 So.2d 536 (La.App. 3rd Cir.), writ denied, 510 So.2d 377 (La.1987), the plaintiff was a pedestrian who suffered a ruptured spleen as a result of being struck by an automobile. The court affirmed a general damage award of $210,000.00. Mr. Seaux also suffered numerous other injuries involving his leg and knee and was still undergoing treatment one year after the accident.
In Sexton v. Louisiana Vacuum Services, Incorporated, 506 So.2d 780 (La.App. 1st Cir.1987), this Court affirmed a general damage award of $175,000.00 for a motorist injured in a head-on collision with a Mack truck. In addition to an injury to his spleen, Mr. Sexton suffered several rib fractures, a scapula fracture, lacerations of the neck and lower lip, and broken teeth. The evidence also showed that after the accident, Sexton's lifestyle changed significantly.
All of these cases involve more extensive traumatic injuries to persons who survived and endured pain and suffering for a longer period of time than did Mrs. Epps. Having reviewed the pertinent jurisprudence, and considering the nature of Mrs. Epps' injuries and the extent and duration of her pain, including the resulting change in the status of her chronic myelogenous leukemia, we conclude that a general damage award of $150,000.00 is the highest amount which the trial court could have reasonably *1347 awarded. Accordingly, the general damages award is modified to this extent.

Loss of Consortium
Mr. Dan Epps, Jr. contends that the trial court erred in failing to make an award for his claim for loss of consortium.
A lump sum judgment of damages is normally presumed to award all the items of damages claimed and proven. Litton, 554 So.2d at 107. Here, the reasons for judgment indicate that the award was for plaintiffs' survival action, but the elements of damage were not itemized. However, since loss of consortium is not an element of damages in a survival action, but is an element of general damages for which we believe Mr. Epps is entitled to recover, we find the trial court erred in not awarding damages for loss of consortium.
This Court has stated that "consortium" includes loss of love and affection, loss of society and companionship, loss of sexual relations, loss of performance of material services, loss of support from the spouse, and loss of aid and assistance. Sexton, 506 So.2d at 784.
The testimony in this case shows that prior to the accident, Mr. and Mrs. Epps enjoyed a close and loving relationship. Mrs. Epps often accompanied Mr. Epps on his charter bus trips, serving refreshments to the passengers and assisting him in his business operation. Other family members testified that prior to the accident, Mrs. Epps cooked the meals for her family, cleaned and maintained their residence and garden, and coordinated family holiday events and meals. Mr. Epps also testified that he and his wife had normal sexual relations before the accident, which was no longer possible after the accident. The record also shows that after the accident, Mrs. Epps was frequently hospitalized, and unable to provide any companionship, aid, assistance or support to Mr. Epps or their minor child. Mr. Epps was required to sell his charter bus and to radically change their family lifestyle after the accident. Based upon this evidence, we conclude that the trial court manifestly erred in failing to make an award for loss of consortium. We hereby reverse the judgment and award Mr. Epps the sum of $25,000.00 for his loss of consortium claim.

Special Damages
Defendants contend that the trial court erred in awarding special damages. They argue that because it found that no recovery was due for wrongful death, the trial court erred in awarding funeral expenses. Defendants also argue that since causation was not proven, the court erred in awarding medical expenses. Finally, defendants claim that the award for loss of wages was erroneous, arguing that Mrs. Epps was incapacitated by leukemia and not by the accident. According to the plaintiffs, the defendants presented no evidence that the special damages would not have been incurred had the accident not occurred.
The plaintiff bears the burden of establishing each and every element of damage claimed. Miller v. Mahfouz, 563 So.2d 1223, 1226 (La.App. 1st Cir.), writ denied, 569 So.2d 967 (La.1990).
In this case, extensive medical evidence, including itemized medical bills totalling $65,802.00, was introduced and amply supports the award for medical expenses based upon the finding that the accident caused Mrs. Epps to enter a blastic crisis. The testimony by means of a written report by G. Randolph Rice, Ph.D., introduced in evidence without objection, and the stipulation by the parties regarding Mrs. Epps' past earnings, clearly establish that Mrs. Epps' loss of wages from August 15, 1986 to February 15, 1987 amounted to $5,944.00. Thus, the trial court did not err in awarding these amounts.
However, in the absence of proof that the accident caused the death of Mrs. Epps, the trial court erred in awarding funeral expenses. Consequently, the judgment is hereby amended to delete the amount of $4,662.88 awarded as funeral expenses.

INTEREST
Finally, defendant Royal Insurance Company assigns error to the award of interest. Although the trial court limited the principal *1348 amount of the judgment against Royal to its $10,000.00 policy limits, the court cast Royal in judgment for interest on the entire amount of the judgment against Thomas, from date of judicial demand until the date of the tender, subject to a credit for the amount of the tender. Royal contends that under the language of its policy, it is obligated to pay pre-judgment interest on its policy limits only, and not on the entire judgment against its insured, citing Boston Old Colony Ins. Co. v. Fontenot, 544 So.2d 739 (La.App. 3rd Cir.1989). Royal maintains that it has no further liability to plaintiffs because it unconditionally tendered its policy limits plus interest on that amount prior to trial. We agree.
The Royal insurance policy provides in pertinent part:

INSURING AGREEMENT
A. We will pay damages for `bodily injury' or `property damage' for which any `insured' becomes legally responsible because of an auto accident. Damages include pre-judgment interest awarded against the `insured.' We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for `bodily injury' or `property damage' not covered under this policy.
* * * * * *

SUPPLEMENTARY PAYMENTS
In addition to our limit of liability, we will pay on behalf of an `insured:'
* * * * * *
3. Interest accruing after a judgment is entered in any suit we defend. Our duty to pay interest ends when we offer to pay that part of the judgment which does not exceed our limit of liability for this coverage.

* * * * * *

LIMIT OF LIABILITY
A. The limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one auto accident. * * *
[Emphasis added]
The insurance policy at issue in Boston Old Colony contained the identical supplementary payments provision quoted above, except that the Boston policy refers to "an `insured'" as "the covered person". 544 So.2d at 740. In that case, the insurer instituted a concursus proceeding after being named a defendant in two consolidated tort actions arising from an automobile accident in which both drivers had died. The court held that the supplementary payments section did not apply and Boston was relieved from any further liability for accrued legal interest on any ultimate judgment rendered in excess of its policy limits because it had paid its policy limits plus interest before trial.
In the present case, the trial court did not disclose the basis for its award of interest. Royal alleges that the award must have been based upon the supplementary payments provision. However, this contention is not necessarily correct as the insuring agreement is also relevant to our determination and provides that "Damages include pre-judgment interest awarded against the `insured.'" According to the language of the supplementary payments provision, Royal's duty to pay interest under that provision ended when it tendered its policy limits before trial. The remaining question is whether the language contained in the section of the policy defining its insuring agreement obligates Royal to pay pre-judgment interest on the entire amount of the judgment against Thomas, an amount clearly in excess of Royal's policy limits.
Plaintiffs assert the trial court was correct in awarding pre-judgment interest against Royal on the entire amount of the judgment against Thomas from the date of judicial demand until the date of tender and suggest that the language of the insuring agreement obligates Royal to pay pre-judgment interest on the entire amount of the judgment.
*1349 Royal maintains that its policy cannot be construed to obligate it to pay pre-judgment interest on any amount in excess of the policy limits. It argues that such a construction would conflict with the abovequoted "Limit of Liability" provision, rendering that provision meaningless. See LSA-C.C. art. 2049.
An insurance policy is a contract, to which rules for construction of written instruments apply. Effect must be given to every part of the insurance policy, if possible. Hemel v. State Farm Mut. Auto. Ins. Co., 211 La. 95, 29 So.2d 483 (La.1947).
Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. art. 2050; First National Bank of Commerce v. City of New Orleans, 555 So.2d 1345, 1348 (La.1990). Similarly, an insurance contract must be construed as a whole; one section is not to be construed separately or at the expense of disregarding other sections. Foret v. Louisiana Farm Bureau Casualty Insurance Company, 582 So.2d 989, 991 (La.App. 1st Cir. 1991). Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include. LSA-C.C. art. 2051. An insurance contract is the law between the parties, and every stipulation therein must be construed as written. Insurers may limit their liability where such limitation is clearly and expressly set forth in the contract and is not violative of public policy. D' Angelo v. Doe, 535 So.2d 31 (La. App. 4th Cir.1988), writ denied, 537 So.2d 1163 (La.1989).
Generally, an insurer owes interest on its policy limits only, from the date of judicial demand until paid, unless the policy provides otherwise. LSA-R.S. 13:4203; See Remedies v. Lopez, 560 So.2d 118 (La. App. 3rd Cir.), writ denied, 563 So.2d 1155 (La.1990). This is interest on a judgment and is owed on the policy limits.
However, automobile liability policies typically provide for the payment of postjudgment interest beyond the policy limits. Generally, this coverage is provided for in a supplementary payments provision. In Doty v. Central Mutual Insurance Company, 186 So.2d 328 (La.App. 3rd Cir.), writ denied, 249 La. 486, 187 So.2d 451 (La.1966), the court, on rehearing, recognized that the insurer and the insured may contractually agree, such as through an insurer's supplementary payments clause, that the insurer will pay, in addition to the principal amount insured plus legal interest thereupon, legal interest upon any excess of policy limits awarded from the date of judgment only, rather than from judicial demand. The court concluded that upon the amount in excess of its policy limits, Central Mutual was liable only for legal interest from date of judgment, although liable under the jurisprudence, for legal interest from judicial demand insofar as its policy limits were awarded.
As the court noted in Doty, in analyzing the purpose of supplementary payments coverage, "the intended purpose was merely to pay for interest for which the insured person would otherwise be liable, where (following the judgment) that person's liability for subsequent interest is occasioned by the insurer's unilateral determination to appeal subsequent to the judgment, within the company's sole control under pertinent policy provisions." Doty, 186 So.2d at 336.
This Court has held that supplementary payment clauses such as the one in the Royal policy are intended to provide supplementary protection to insureds only for interest accruing after entry of judgment. Malbrough v. Wallace, 594 So.2d 428 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La.1992); Barnes v. Thames, 578 So.2d 1155 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991). Moreover, supplementary protection for the payment of interest after the entry of judgment on an amount in excess of the policy limits does not apply where the insurer tenders its policy limits before trial. Boston Old Colony, 544 So.2d 739. Thus, we conclude that pre-judgment interest is not recoverable under the supplementary payments provision of Royal's policy. As the *1350 policy clearly states, "Our duty to pay interest ends when we offer to pay that part of the judgment which does not exceed our limit of liability for this coverage."
Having concluded that pre-judgment interest is not recoverable under the supplementary payments provision, we must now determine whether pre-judgment interest is covered by the insuring agreement, as an element of damages.
By the language "[d]amages include pre-judgment interest awarded against the `insured,'" Royal merely acknowledges that as a class or element of damages, it will include payment of pre-judgment interest. Whether that means all pre-judgment interest awarded against its insured is unclear when this statement in the insuring agreement is read out of context. However, reading this statement in pari materia with the limitation of liability provision, we conclude that Royal is not obligated to pay pre-judgment interest on any amount which exceeds its policy limits as stated in the limit of liability section of the policy. Although Royal defines pre-judgment interest as an element of damages, we are unable to agree with plaintiffs' contention that by the language of its insuring agreement, Royal has clearly obligated itself to pay all pre-judgment awarded against its insured.
To hold otherwise, would force an insurance company to acquiesce to a plaintiff's demand at an early stage of the proceedings where it may have a meritorious defense, rather than run the risk of paying substantial pre-judgment interest due to the delays engendered by crowded dockets, should the plaintiff eventually recover. See Dittus v. Geyman, 68 Mich.App. 433, 242 N.W.2d 800 (Mich.Ct.App.1976).
In this case, we conclude that the limitation of liability provision in Royal's policy restricts the principal amount of Royal's liability on a judgment to the stated policy limits; and, limits its liability for pre-judgment interest to interest on the stated policy limits. Reading the policy at issue in its entirety, we conclude that the Royal policy provided for liability coverage up to the stated policy limits, and for payment of pre-judgment interest on any amount rendered against its insured up to the policy limits.
Insurers may limit their liability where such limitation is clearly and expressly set forth in the contract and is not violative of public policy. D'Angelo, 535 So.2d at 32. We conclude that this limitation is not violative of public policy. This court has previously recognized that insurers may lawfully limit their liability for post-judgment interest which exceeds policy limits. See Malbrough, 594 So.2d 428; Barnes, 578 So.2d 1155. Likewise, we find no impediment to an insurer limiting its liability for pre-judgment interest to its stated policy limits.
Accordingly, the judgment of the trial court is reversed insofar as it cast Royal for any amount in excess of the policy limits plus interest from date of judicial demand, which Royal previously tendered to plaintiffs.
This assignment of error has merit.

CONCLUSION
For the foregoing reasons, we reverse that portion of the judgment awarding plaintiffs the sum of $4,662.88 for funeral expenses and lower the general damages award to the sum of $150,000.00. The denial of Dan Epps, Jr.'s claim for loss of consortium is reversed, and judgment is accordingly granted in his favor in the amount of $25,000.00. The judgment is also reversed insofar as it cast Royal Insurance Company in judgment for interest on the entire amount of the judgment against its insured, Juanita L. Thomas, from date of judicial demand until the date of tender, subject to a credit for the amount of the tender. In all other respects, the judgment is affirmed. Costs of this appeal are assessed 50% against the plaintiffs and 50% against the defendants.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

ON APPLICATION FOR REHEARING
We grant the rehearing for the limited purpose of clarifying certain language in the conclusion of our original opinion.
*1351 The judgment of the trial court is reversed to the extent it cast Royal for any payment beyond the policy limits plus interest on those limits, from date of judicial demand, until date of tender. As the record reflects, such payment by Royal has already been made.
NOTES
[1] Dan Epps, Jr. is Clara's surviving spouse. Demetra Epps, Sharon Ann Gallerson, and Darryl Leon Gallerson are Clara's adult children. Demetra reached majority during the pendency of these proceedings.
[2] Rosemary Ellois, Epps' passenger, testified that she experienced pain for approximately two months following the accident, which she attributed to the accident and the impact of the two vehicles involved.
[3] When the disease enters this stage, it is also referred to as a blast or blastic crisis. A blast is an area where a proliferation of cancerous cells occurs.
[4] We do not independently make an award for general damages because the trial court's error in finding causation had no effect on its determination of damages.